**In re MOORE, Father of Adjudged Dependent Child.**

[Cite as *In re Moore*, 153 Ohio App.3d 641, 2003-Ohio-4250.]

Court of Appeals of Ohio,
Third District, Hardin County.

No. 6–03–05.

Decided Aug. 11, 2003.

Richard W. Miller III, for appellant.

Rick Rodger, Hardin County Assistant Prosecuting Attorney, for appellee Hardin County Department of Job and Family Services.

Ryan Zerby, guardian ad litem.

SHAW, Judge.

{¶ 1} The appellant, Cecil Moore, appeals from the March 3, 2003 judgment of the Common Pleas Court, Juvenile Division, of Hardin County, Ohio, granting permanent custody of his daughter, A.D., to the Hardin County Department of Job and Family Services ("DJFS") and terminating his parental rights.

{¶ 2} On June 8, 2001, A.D., age ten, rode her bicycle to the Kenton Police Department sometime between 1:00 and 2:00 a.m. Upon arriving at the police station, she informed officers that she had gone to sleep around 9:00 p.m. that evening and when she awoke, her father was not at home. At the time, A.D. was in the sole custody of her father, Cecil. She further stated that Cecil's girlfriend, Crystal, had come to their home and took A.D. with her to find her father. However, when the two could not locate Cecil, Crystal took A.D. back home and left. A.D. stated that she became scared and that was why she rode her bike to the police station. A.D.'s mother, Francine, was located, and A.D. was sent home with her for the night.

{¶ 3} Later that afternoon, a complaint was filed alleging that A.D. was a dependent child and requesting that she be placed in either the temporary custody or protective supervision of DJFS. A shelter care hearing was then held. Both of A.D.'s parents were present in court at this hearing but were unrepresented by counsel. The court informed both parents at that time that they were entitled to counsel, including court-appointed counsel if they satisfied the indigency requirements, and that a case plan that they would be required to follow might be ordered by the court. The court then placed A.D. in the temporary custody of DJFS. Subsequently, separate attorneys were appointed for Cecil and Francine, as both were indigent.[1]

{¶ 4} A.D. was placed in foster care, and a case plan aimed at reunification with Cecil was adopted by the trial court on August 6, 2001. Included in this case plan was a schedule of supervised visitation for Cecil.[2] In addition, the plan required Cecil to complete a drug-and-alcohol assessment and follow all recommendations, submit to a psychological evaluation, attend any recommended counseling, submit to random drug screens, attend at least three NA/AA meetings a week, sign all necessary releases of information, not use alcohol or illegal drugs, and participate

---

1. Attorney Greg Grimslid was appointed to represent Francine. Although Francine never appeared at another hearing, Grimslid was always present on her behalf. Francine is not a party to the instant appeal, having not objected to the granting of permanent custody to DJFS.

2. Visitation with A.D. was also scheduled for Francine, but she never attended any visits with A.D.

and successfully complete an inpatient treatment program if one was recommended by his counselor.

{¶ 5} Throughout the next year Cecil complied with the case plan intermittently. Although he regularly visited A.D., the case plan had to be modified on September 26, 2001, to limit his visits because he acted inappropriately during these visits. According to those who supervised these visits, Cecil brought a knife to the visitation on at least two occasions, blamed A.D. for causing DJFS to remove her from his custody, accused her of not loving him, cussed during his visits, and talked badly about DJFS and her foster parents. In addition, all phone calls between Cecil and A.D. were stopped for a period of time because of Cecil's behavior while talking to his daughter. He also missed a number of visits with A.D. because he was incarcerated from November 2001 to January 2002. Cecil also failed to submit to random drug testing, delayed in signing the required releases of information, delayed in completing the drug-and-alcohol assessment, rarely attended NA/AA meetings, and did not participate in counseling. Cecil was also charged with attempting to buy prescription drugs with an altered prescription and operating a motor vehicle while intoxicated during this time period. In addition, he refused to attend parenting classes.

{¶ 6} Although Cecil did attempt to comply with the case plan from February to June 2002, which resulted in visitations being increased on May 9, 2002, he once again began acting inappropriately and his visits were reduced on July 8, 2002. Furthermore, he continued to be noncompliant with the terms of the case plan and missed several more visits with A.D. Accordingly, on August 19, 2002, DJFS filed for permanent custody of A.D. Initially, Cecil decided to voluntarily relinquish his parental rights and responsibilities to A.D. on September 5, 2002. However, he recanted and terminated his court-appointed counsel on November 20, 2002. At that time, Cecil signed a document stating that he would obtain counsel of his choosing within seven days and inform the court as to who his new counsel would be. Cecil did not do so, and on January 2, 2003, the court notified him that a permanent custody hearing would be held on February 24, 2003.

{¶ 7} On February 24, 2003, Cecil appeared for the permanent custody hearing without counsel. After the trial court discussed certain matters with him, he elected to proceed without an attorney. In addition, he stipulated to the admission of various exhibits, which contained information pertaining to his compliance with the case plan, as well as other issues. At the conclusion of the hearing, the trial court granted permanent custody of A.D. to DJFS and terminated Cecil's parental rights and responsibilities. This decision was reflected in the trial court's judgment entry of March 3, 2003. This appeal followed, and Cecil now asserts four assignments of error:

"The trial court erred when it failed to comply with Ohio Revised Code Section 2151.314 by failing to advise the appellant/father of the possible consequences of the failure to comply with a journalized case plan.

"The trial court erred when it proceeded to conduct the permanent custody hearing when the appellant/father was unrepresented by counsel.

"The trial court erred when it admitted the DJFS exhibits upon stipulation of the parties in the permanent custody hearing.

"Appellant/father, Cecil Moore, was denied effective assistance of counsel."

### First Assignment of Error

{¶ 8} In his first assignment of error, Cecil maintains that the trial court erred during the initial shelter-care hearing by not informing him of the possible consequences of failing to comply with the case plan. The Ohio Revised Code provides that when a child is taken into shelter care, "the intake or other authorized officer of the court shall immediately make an investigation and shall release the child unless it appears that * * * shelter care is warranted[.]" R.C. 2151.314(A). If the investigating officer determines that shelter care is warranted, a complaint must be brought and an informal shelter-care hearing must be promptly held. R.C. 2151.314(A). When the court holds a shelter-care hearing, the parents of the child are to be given reasonable oral or written notice of the time, place, and purpose of the shelter-care hearing if they can be located. R.C. 2151.314(A). In addition, when the complaint alleges that the child is abused, neglected, or dependent, this notice "shall inform them [the parents] that a case plan may be prepared for the child, the general requirements usually contained in case plans, and the possible consequences of the failure to comply with a journalized case plan." R.C. 2151.314(A).

{¶ 9} Once a child has been placed in the temporary custody of a children's services agency, the agency is required to prepare and maintain a case plan for that child. R.C. 2151.412(A)(2). Further, R.C. 2151.412(E)(1) states that "[a]ll parties, including the parents * * * are bound by the terms of the journalized case plan. A party that fails to comply with the terms of the journalized case plan may be held in contempt of court." One of the enumerated goals of a case plan for a child in the temporary custody of a children's services agency is "[t]o eliminate with all due speed the need for the out-of-home placement so that the child can safely return home." R.C. 2151.412(F)(1)(b). This goal is commonly referred to as reunification.

{¶ 10} The record in this case reveals that the initial case plan, journalized on August 6, 2001, was aimed at the reunification of Cecil and A.D. According to the case plan, Cecil was required to do various things, as previously noted, so that he could remedy the problems in his personal life that kept him from properly

parenting A.D. Included in this case plan, as well as each subsequent amendment to the plan, were the directives of R.C. 2151.412(E)(1) regarding compliance with the plan and the possibility of contempt. However, neither the case plan nor the trial court during the shelter care hearing informed Cecil that a failure to comply with the case plan could possibly lead to the termination of his parental rights. Cecil now maintains that the trial court's failure to advise him of this possible consequence constitutes reversible error because the court was required to inform him of this possibility. We disagree.

{¶ 11} Initially we note that during the shelter care hearing, the trial court advised Cecil that a case plan might be prepared in order "to alleviate or to correct the problem that arose and caused the dependency." However, the court failed to inform Cecil of the possible consequences that his failure to comply with the case plan could invoke. Although the Revised Code requires that the notice given to parents regarding a shelter-care hearing inform them of the possible consequences of the failure to comply with a journalized case plan should one be prepared, it is silent as to the resulting ramifications in the event that the trial court fails to do so. See R.C. 2151.314(A). In any event, any initial prejudice that Cecil may have suffered due to the trial court's failure to provide him with this information during the shelter-care hearing was cured well before his parental rights were terminated in 2003, as the following facts indicate.

{¶ 12} First, the case plan and each amendment thereto stated that Cecil had to comply with the plan's requirements. The case plan also listed the problems associated with A.D.'s dependent status and provided mandates for Cecil in an effort to eliminate the need for A.D.'s out-of-home placement. Further, Carrie Dodson, a protective service worker for DJFS, testified on August 31, 2001, that Cecil told her that he would not follow the case plan because DJFS did not have a right to request that he do so. In response to this, Dodson informed Cecil that the case plan was signed by the judge and that he had to comply.

{¶ 13} Several hearings were also held during the pendency of this action, most of which significantly involved Cecil's lack of compliance with the mandates of the case plan. In addition, on the *same day* as the shelter-care hearing and two months prior to the adoption of the initial case plan, counsel was appointed to represent Cecil and no type of objection to the case plan was filed. Certainly, if counsel properly represented Cecil, as we are required to presume, *State v. Hoffman* (1998), 129 Ohio App.3d 403, 407, 717 N.E.2d 1149, Cecil was well aware that he had to comply with the case plan or risk losing his daughter. Moreover, Cecil vacillated between voluntarily relinquishing his parental rights to A.D. to DJFS and contesting the agency's actions. Furthermore, at one point Cecil did, in fact, attempt to follow the case plan for a short while. Last, DJFS largely based its motion for permanent custody, filed on August 19, 2002, upon Cecil's

lack of compliance with the case plan's mandates. In this motion, which was provided to Cecil, DJFS repeatedly stated that the agency was seeking permanent custody of A.D. and for Cecil's parental rights to be terminated because he failed to comply with the case plan despite the repeated efforts of DJFS.

{¶ 14} All of the aforementioned information taken together evidences Cecil's knowledge that he had to comply with the case plan in order to be reunified with A.D. or risk losing her to DJFS in the event that he did not comply. Most of this knowledge was acquired well before DJFS even filed its permanent custody motion. Thus, Cecil has failed to demonstrate how the failure to inform him of the possible consequences during the initial shelter-care hearing caused him any prejudice, especially in light of the fact that he was represented by counsel throughout these proceedings until he terminated his attorney three months after the motion for permanent custody was filed.

{¶ 15} Accordingly, while the trial court may have erred by not initially informing Cecil of the fact that permanent custody to DJFS was one possible consequence of failing to comply with the case plan, all of the subsequent information provided to him eliminated any prejudice that the initial error may have caused. Furthermore, even if Cecil had fully complied with the case plan, this fact alone did not guarantee that permanent custody to DJFS would be denied. See, e.g., *In re Mraz,* 12th Dist. Nos. CA2002–05–011 and CA 2002–07–014, 2002-Ohio-7278, 2002 WL 31883343; *In re Porter,* 9th Dist. Nos. 21080 and 21089, 2002-Ohio-4860, 2002 WL 31060270. In addition, the issue of notification that a termination of his parental rights was a possibility if he did not comply with the case plan was not raised at any time in the court below even when this possibility was unquestionably made aware to him in the motion for permanent custody. Therefore, the first assignment of error is overruled.

*Second Assignment of Error*

{¶ 16} Cecil next maintains that the trial court erred in conducting the permanent custody hearing when he was not represented by counsel. Our review of this assignment of error begins by noting that "[i]t is well recognized that the right to raise a child is an 'essential' and 'basic civil right.'" *In re Hayes* (1997), 79 Ohio St.3d 46, 48, 679 N.E.2d 680, citing *In re Murray* (1990), 52 Ohio St.3d 155, 157, 556 N.E.2d 1169. Thus, "a parent's right to the custody of his or her child has been deemed 'paramount'" when the parent is a suitable person. *In re Hayes,* supra (citations omitted); *In re Murray,* supra. Because a parent has a fundamental liberty interest in the custody of his or her child, this important legal right is "protected by law and, thus, comes within the purview of a 'substantial right[.]'" *In re Murray,* supra. Based upon these principles, the Ohio Supreme Court has determined that a parent "must be afforded every

procedural and substantive protection the law allows." *In re Hayes*, supra. Thus, it is within these constructs that we now examine the second assignment of error.

{¶ 17} R.C. 2151.352 is entitled "A child or the child's parents, custodian, or other person in loco parentis of such child * * * to representation by legal counsel at all stages of the proceedings * * * and if, as an indigent person, any such person is unable to employ counsel, to have counsel provided for the person[.]" See, also, Juv.R. 4(A). This court has previously held that "[t]his statutory right to appointment of counsel expands beyond the federal and state constitutional requirements to afford the right to counsel at juvenile proceedings in general." *In re Mull* (Mar. 24, 1997), 3d Dist. No. 13–96–38, 1997 WL 155412, at * 5; see, also, *State ex rel. Asberry v. Payne* (1998), 82 Ohio St.3d 44, 46, 693 N.E.2d 794, quoting *In re Mull*, supra. Therefore, Cecil was entitled to representation in these proceedings.

{¶ 18} In the case sub judice, Cecil was notified of his right to counsel in all juvenile court proceedings at the initial shelter care hearing. At this time, the court also informed both Cecil and Francine that counsel would be appointed for them if they qualified for indigent status and that they would have to fill out an application to determine whether they qualified for court-appointed counsel. Cecil submitted his application, and counsel was appointed on June 8, 2001, the same day A.D. was removed from his care, because he qualified for indigent status at that time. However, seventeen months later, on November 20, 2002, Cecil requested that he be permitted to terminate his counsel and to retain new counsel. At that time, Cecil signed a document that stated that he would hire his own attorney, who would be required to enter an appearance within fourteen days from that date. The permanent custody hearing, which was originally scheduled for October 21, 2002, but later continued because Cecil agreed to relinquish permanent custody, was rescheduled from its then-current date of November 22, 2002, until such time as his new attorney could prepare for the hearing. In addition, the trial court ordered Cecil to inform the court as to who his new counsel would be within seven days. However, new counsel did not enter an appearance within fourteen days, and Cecil never obtained counsel.

{¶ 19} On January 2, 2003, Cecil was notified that the permanent custody hearing was to be held on February 24, 2003. Included in this notice was the following provision: "All parties are entitled to a lawyer in all proceedings in Juvenile Court. The Court will appoint a lawyer to provide legal representation if you cannot afford a lawyer and meet certain requirements." The same provision was also included in his notice of the October 21, 2002 permanent custody hearing. Although he knew that he was entitled to a court-appointed lawyer if he was indigent, that he had to submit an application in order for the

court to determine his indigent status, and that the permanent custody hearing was rescheduled, throughout the next three months, Cecil never requested that the court appoint him new counsel. He also did not submit an application of indigency so that the court could determine whether he was still unable to afford an attorney. Rather, he appeared at the permanent custody hearing without an attorney and indicated that he was ready to proceed.

{¶ 20} Cecil now asserts that the trial court was obligated to determine whether his waiver of counsel was made knowingly, voluntarily, and intelligently, including informing him that he would be entitled to court-appointed counsel if indigent. See *In re Johnson* (1995), 106 Ohio App.3d 38, 41, 665 N.E.2d 247 (court was required to determine whether such a waiver by a juvenile in a delinquency proceeding was properly made under the totality of the circumstances surrounding the waiver). However, the decision whether to appoint substitute counsel rests within the sound discretion of the trial court. *In re Mraz*, 12th Dist. Nos. CA2002–05–011 and CA2002–07–014, 2002-Ohio-7278, 2002 WL 31883343, citing *State v. Dukes* (1986), 34 Ohio App.3d 263, 518 N.E.2d 28. Accordingly, the trial court's decision on such an issue will not be reversed absent an abuse of that discretion, which connotes a decision that is "unreasonable, arbitrary or unconscionable." *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144.

{¶ 21} Here, Cecil was repeatedly informed of his right to counsel and the right to court-appointed counsel if indigent. In addition, he knew that in order to be found indigent, he had to submit an application with financial information. He also knew that a permanent custody hearing was going to be held, yet he did not obtain his own counsel, ask the court for new counsel, or submit an application of indigency. Instead, he elected to attend the permanent custody hearing without the benefit of counsel. Further, he told the court that he was ready to proceed pro se and never asked the court for counsel at any point during the hearing. Given the totality of the circumstances, including the fact that he was informed of his right to counsel on numerous occasions, the trial court did not err in concluding that the waiver was made knowingly, voluntarily, and intelligently even without further inquiry. Thus, the court did not err in proceeding with the permanent custody hearing despite Cecil's lack of representation. In addition, the trial court did not abuse its discretion in failing to appoint substitute counsel, as none was ever requested. Accordingly, the second assignment of error is overruled.

### Third Assignment of Error

{¶ 22} Cecil next asserts that the trial court erred when it admitted Exhibits 2–11, to which he and the state stipulated, into evidence during the

permanent custody hearing. The basis for this assertion rests largely upon the fact that Cecil was not represented by counsel during this hearing. Essentially, he maintains that he did not fully understand the ramifications of stipulating to these exhibits, what the exhibits contained, and that by stipulating to their admission he was agreeing to the veracity of their contents. In addition, Cecil contends that the record does not reflect that he clearly stipulated to the admission of these exhibits. We disagree.

{¶ 23} As discussed in the preceding assignment of error, Cecil elected to proceed with the permanent custody hearing without the benefit of counsel. Thus, he opted to shoulder the responsibility of representing his interests, including having to make certain evidentiary determinations. Early in the hearing, the state informed the court that it had spoken with Cecil about Exhibits 2–11 and that he was willing to stipulate to their admission. The state also made the following statement: "I'm going to go through those one by one that with the understanding that with these exhibits and the information contained therein, the Court, most likely, *will be entering a finding of permanent custody based on the information that's in these reports.*" (Emphasis added.) The state then proceeded to identify each of these exhibits.

{¶ 24} Exhibit 2 consisted of the original case plan. Exhibit 3 was the first amendment to the case plan, Exhibit 4 contained the second amendment, and Exhibit 5 was the third amendment. Exhibit 6 consisted of the visitation log of DJFS for A.D. from July 10, 2002, to February 19, 2003. Exhibit 7 reflected Cecil's child-support arrearage. Exhibits 8 and 9 were letters from Bill Geiger, an outpatient therapist who evaluated Cecil. Exhibits 10 and 11 consisted of two letters written by Rebecca Renner, a licensed professional clinical counselor who served as A.D.'s therapist while she was in the custody of DJFS. After the recitation of the exhibits, the trial court asked Cecil whether he was afforded the opportunity to review the proposed exhibits. In response, Cecil stated that he did not receive copies of these exhibits until that day. The following discussion was then had between the court, Cecil, and the prosecutor, Rick Rodger:

"THE COURT: Are you willing to stipulate to the admission of Exhibits 2, 3, 4, 5, 6, 7, 8, 9, 10, and 11, Mr. Moore?

"MR. MOORE: I also haven't stipulated to nothing because I have got no counsellor [*sic*] representing me. So how do I stipulate to any of these because I don't know anything about any of the stipulations you're talking about?

"THE COURT: All right. So—

"MR. MOORE: And I don't understand any of this from day one. I haven't understood any of it from day one because I haven't had a lawyer representing me from day one. I don't know anything about this. You know, I'm all

confused and I get confused when I come in here and I get handed more of this stuff that I get confused about. I know nothing.

"THE COURT: All right. So we'll proceed with the evidence then.

"MR. RODGER: Do you want to hear everything, Mr.—

"MR. MOORE: No, I don't want to hear all that.

"THE COURT: That's the only choice we have is to either hear the evidence or stipulate to it.

"MR. MOORE: I'll stipulate to it. I don't want to hear it.

"MR. RODGER: Do you understand by stipulating that the Court's going to use this information for—

"MR. MOORE: What choice do I have?

"MR. RODGER:— for granting a permanent custody?

"MR. MOORE: What choice do I have at this point?

"MR. RODGER: I'm just asking, do you understand that?

"MR. MOORE: I guess what you told me I understand to a certain point and that's what you guys told me from this morning. I understand what you're telling me. Okay? And as far as—

"MR. RODGER: With that—

"MR. MOORE:— as far as the other understanding, no I don't because I don't understand anything. So why's it went [sic] this far?"

{¶ 25} After further discussion with Prosecutor Rodger, Cecil admitted that the two of them had briefly gone over the exhibits and that he understood that by stipulating to their admission, the exhibits would be submitted to the court for its consideration. Prosecutor Rodger also inquired as to whether Cecil understood that he was not representing Cecil during this discussion, and Cecil indicated that he understood. Cecil then informed the court that he would stipulate to the exhibits, understanding that they would be used in the court's determination of whether to grant permanent custody to DJFS, because he did not want to hear the evidence against him. In fact, Cecil was quite adamant about not hearing any evidence against him. After determining that Cecil was not under the influence of any drugs, alcohol, or medication and that he understood the intended use of the exhibits, the trial court admitted Exhibits 2–11 into evidence.

{¶ 26} "[T]he decision of whether or not to admit evidence rests in the sound discretion of the [trial] court[.]" *Wightman v. Consol. Rail Corp.* (1999), 86 Ohio St.3d 431, 437, 715 N.E.2d 546, citing *Peters v. Ohio State Lottery Comm.* (1992), 63 Ohio St.3d 296, 299, 587 N.E.2d 290; see, also, *State v. Sage* (1987), 31 Ohio St.3d 173, 182, 31 OBR 375, 510 N.E.2d 343. Thus, this court will not disturb the trial court's decision unless it is unreasonable, arbitrary, or capricious. In

addition, this abuse of discretion must have materially prejudiced the objecting party. See *State v. Lowe* (1994), 69 Ohio St.3d 527, 532, 634 N.E.2d 616, citing *State v. Maurer* (1984), 15 Ohio St.3d 239, 265, 15 OBR 379, 473 N.E.2d 768.

{¶ 27} Contrary to Cecil's assertions in his brief to this court that he did not understand what he was doing by stipulating to these exhibits, the record reflects that he was made well aware of what was occurring and was given the option either to stipulate to the exhibits or to compel the state to present testimonial evidence in order to sustain its burden of proof. Cecil elected the former. Given the extensive discussion with him and his insistence that he did not want to *hear* evidence against him, the trial court did not abuse its discretion in admitting these exhibits into evidence. Therefore, the third assignment of error is overruled.

*Fourth Assignment of Error*

{¶ 28} In his final assignment of error, Cecil maintains that he was denied the effective assistance of counsel throughout these proceedings. As previously noted, R.C. 2151.352 entitles "[a] child or the child's parents, custodian, or other person in loco parentis of such child * * * to representation by legal counsel at all stages of the proceedings * * * and if, as an indigent person, any such person is unable to employ counsel, to have counsel provided for the person[.]" See, also, Juv.R. 4(A). This court has previously held that "[t]his statutory right to appointment of counsel expands beyond the federal and state constitutional requirements to afford the right to counsel at juvenile proceedings in general." *In re Mull* (Mar. 24, 1997), 3d Dist. No. 13–96–38, 1997 WL 155412, at * 5; see, also, *State ex rel. Asberry v. Payne* (1998), 82 Ohio St.3d 44, 46, 693 N.E.2d 794, quoting *In re Mull*, supra. Furthermore, "the right to counsel implies effective assistance of counsel." *In re Mull*, supra, citing *In re Richardson* (Aug. 19, 1987), 4th Dist. No. CA 1674, 1987 WL 15980; *Williams Cty. Dept. of Social Serv. v. Gilman* (June 4, 1982), 6th Dist. No. WMS–81–26, 1982 WL 6438.

{¶ 29} The two-part test for determining ineffective assistance of counsel announced in *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674, and adopted by the Ohio Supreme Court in *State v. Smith* (1985), 17 Ohio St.3d 98, 100, 17 OBR 219, 477 N.E.2d 1128, "has been utilized to give effect to R.C. 2151.352 and Juv.R. 4(A)." *In re Mull*, supra, citing *In re Richardson*, supra. The first prong of *Strickland* requires a showing that the attorney's performance was deficient. *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052, 80 L.Ed.2d 674. Once the client is able to show a deficient performance, the second prong requires a demonstration that the client was prejudiced by counsel's deficient performance. Id. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 30} As to the first prong of the test, courts are to afford a high level of deference to the performance of trial counsel. *State v. Bradley* (1989), 42 Ohio St.3d 136, 142, 538 N.E.2d 373. In addition, attorneys licensed by the state of Ohio "are presumed to provide competent representation." *State v. Jones* (Sept. 27, 2000), 3d Dist. No. 02-2000-07, 2000 WL 1420271, citing *State v. Hoffman* (1998), 129 Ohio App.3d 403, 407, 717 N.E.2d 1149. The second prong regarding reasonable probability requires a probability sufficient to undermine the confidence in the outcome of the trial. Id.

{¶ 31} In the case sub judice, Cecil maintains that his appointed counsel was ineffective in three respects. First, Cecil asserts that trial counsel was ineffective for having withdrawn his motion for contempt and by having failed to follow through with the objections filed on his behalf. The motion for contempt, filed on June 20, 2002, alleged that Carrie Dodson should be held in contempt for using information obtained by her through the release of medical information authorized by Cecil pursuant to the case plan in order to slander him to others. In addition, on July 9, 2002, counsel for Cecil initially objected to one of the amendments to the case plan that decreased Cecil's visitation with A.D. However, both of these filings were withdrawn on September 5, 2002. At that time, Cecil indicated that he wanted to surrender permanent custody of A.D. to DJFS. Thus, counsel withdrew the motion for contempt and the objections to the case plan.

{¶ 32} Given the circumstances surrounding the withdrawal of these filings, namely Cecil's decision to surrender permanent custody, we do not find that counsel was ineffective by not pursuing these filings further, as those issues effectively became moot. Moreover, neither of these issues was relevant to the determination to grant permanent custody to DJFS, and Cecil has failed to demonstrate how he was prejudiced by any deficient performance of counsel, assuming arguendo that any even existed.

{¶ 33} Next, Cecil maintains that counsel was ineffective for failing to represent his interests throughout these proceedings. However, Cecil does not provide any basis for this assertion whatsoever. He neither indicates how counsel failed or how any such failure caused him prejudice. Our review of the record in its entirety reveals that counsel never missed a hearing or ever failed to represent Cecil's interest throughout the time he was appointed to represent Cecil. Without any indication of counsel's failure to zealously represent Cecil, we do not find that his attorney provided ineffective assistance.

{¶ 34} Last, Cecil asserts that two comments made by his former attorney during the dispositional hearing evidences the ineffectiveness of counsel he received. Specifically, counsel stated that the ongoing proceedings aimed at reunification might convert to a permanent custody case if neither of the parents

was going to cooperate. Later in the hearing, Cecil's attorney requested that any support obligation imposed upon his client be based upon minimum wage because he worked only intermittently. Prosecutor Rodger then stated that Cecil had informed DJFS that he was working. In response, his attorney stated that Cecil "claims a lot of things." Cecil now maintains that these two comments demonstrate counsel's ineffectiveness. We disagree.

{¶ 35} While these comments may not have been wholly appropriate, they certainly do not amount to ineffectiveness, nor do they demonstrate that counsel did not zealously represent Cecil, especially in light of the entire record. Rather, these two comments were said off-handedly and were of no consequence to the trial court's decision to grant permanent custody. Therefore, the fourth assignment of error is overruled.

{¶ 36} For these reasons, the judgment of the Common Pleas Court, Juvenile Division of Hardin County, Ohio, is affirmed.

Judgment affirmed.

WALTERS and CUPP, JJ., concur.