[Cite as *In re D.L.S.*, 2015-Ohio-2809.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

IN RE:

D.L.S.

CASE NO. 5-15-04

ALLEGED DEPENDENT CHILD.　　　**O P I N I O N**

[JASON SHEARER - APPELLANT]

IN RE:

D.W.S.

CASE NO. 5-15-05

ALLEGED DEPENDENT CHILD.　　　**O P I N I O N**

[JASON SHEARER - APPELLANT]

Appeals from Hancock County Common Pleas Court
Juvenile Division
Trial Court Nos. 20133023 and 20133024

**Judgments Affirmed**

**Date of Decision:  July 13, 2015**

APPEARANCES:

　　*F. Stephen Chamberlain* for Appellant

　　*Rebecca S. King-Newman* for Appellee

**WILLAMOWSKI, J.**

{¶1} In this consolidated appeal, Father-Appellant, Jason Shearer ("Jason"), appeals the February 3, 2015 judgments of the Hancock County Court of Common Pleas, Juvenile Division, which granted the motions for permanent custody of his children, D.L.S. and D.W.S., filed by Appellee, Hancock County Job and Family Services—Children's Protective Services Unit ("the Agency"), and terminated Jason's parental rights. For the reasons that follow, we affirm the trial court's judgments.

*Background and Procedural History*

{¶2} D.L.S. and D.W.S. are minor children of Jason and Heather Shearer ("Heather"). D.L.S. has multiple medical conditions, which include cerebral palsy, polycystic kidney disease, and a seizure disorder. He is fed via tube and cannot move without assistance. As of January 2015, he was described as medically fragile, underweight, and non-verbal at eight years old.

{¶3} On September 18, 2013, the Agency filed complaints alleging that D.L.S. and D.W.S. were dependent children and requesting a disposition of protective supervision by the Agency or a disposition of temporary custody. (R. at 1.[1]) Together with the complaints, the Agency filed motions for dispositional interim orders. On September 23, 2013, the trial court conducted a hearing on the

---

[1] Proceedings relevant to this appeal were held together in the trial court. As a result, the relevant docket entries are the same in both cases. For simplicity, we cite to the Hancock County Common Pleas Court's docket number 20133023 throughout this opinion.

motions ("a shelter care hearing"), and placed the children in protective supervision of the Agency. The children remained in the physical custody of Heather at the time. (R. at 5.) The trial court ordered the parents to complete mental health and substance abuse assessments and continued the matters for adjudication on November 7, 2013. (*Id.*) Jason was not present at that hearing, "as his whereabouts [were] unknown." (*Id.*) The trial court appointed a guardian ad litem for the children. (R. at 7.)

{¶4} Jason appeared at the hearing on November 7, 2013, and requested that the matters be continued so that he could obtain an attorney. (R. at 9.) The rescheduled adjudication hearing took place on November 26, 2013. Jason was not present, although the trial court noted that he was "duly notified" of the hearing. (R. at 12.) "[U]pon agreement of all parties," the trial court found by clear and convincing evidence that that D.L.S. and D.W.S. were dependent children. (*Id.*) The trial court ordered that the children remain in protective supervision of the Agency while in Heather's custody. At the same time, the trial court allowed Heather and the children to move to West Virginia, to live with relatives. (*Id.*)

{¶5} On December 13, 2013, the matters again came before the trial court upon the Agency's request for an ex parte order of emergency temporary custody. (*See* R. at 13.) The Agency reported that Heather was back in Ohio and that she had placed the children in Jason's care, because she was in need of substance

abuse treatment and did not have "anywhere to live or care for the children." (*Id.*) Based on the Agency's report, which listed concerns about Jason's domestic violence, criminal history, refusal of drug screening, residing with a person who had criminal charges for possession of cocaine, and his refusal to cooperate with the Agency, the trial court placed the children in the emergency temporary custody of the Agency. (*Id.*)

{¶6} Another hearing took place on December 18, 2013. Jason was present with his legal counsel, Brad Hubbell. The trial court ordered that the ex parte orders remain in effect upon "agreement of all parties present," but allowed both parents to have supervised visitations with the children at the discretion of the Agency. (R. at 17.) The matters came again before the trial court on February 21, 2014. Jason was present with his new counsel, Carroll Creighton. Upon the parties' sworn testimony, and agreement of the parties, the trial court ordered temporary custody of the children to the Agency. (R. at 26.)

{¶7} On November 3, 2014, the Agency filed motions for permanent custody of the children. The trial court conducted a hearing on the motions. Neither parent was present at the hearing, although their attorneys appeared on their behalf. The trial court made a finding that the parents "have been duly notified." (R. at 56.) The parts of the hearing testimony that are relevant to this appeal are summarized below.

### *Trial Testimony*

**{¶8}** Rebecca Shumaker ("Ms. Shumaker"), was an ongoing caseworker for the Shearer family on behalf of the Agency. She testified that the Agency became involved with the family pursuant to "multiple reports" regarding neglect and medical neglect in the care of D.L.S. and D.W.S., which caused the Agency to investigate the case further. (Tr. at 35, 37.) Ms. Shumaker indicated that there had been prior reports and investigations into the family by the Agency for medical neglect, drug use, and truancy for the children. (Tr. at 37.) Ms. Shumaker testified that upon the Agency's involvement in September 2013, the children remained in Heather's custody, while the Agency assumed protective supervision. (Tr. at 36-38.) At the time, Jason was not involved in the protective supervision because he lived in California according to the Agency's reports. (Tr. at 48-49.) There was a civil protection order ("CPO") in place, which prohibited Jason from contacting Heather or the children because of "extensive violent history regarding Mrs. Shearer." (Tr. at 48.)

**{¶9}** Ms. Shumaker testified that Heather lived in the domestic violence center in November 2013, but she was asked to leave due to the fact that she was violating the shelter's rules by "having a great deal of contact" with Jason, in spite of the CPO. (Tr. at 45-46.) It appeared that on October 31, 2013, the trial court terminated the CPO upon Heather's petition. (Tr. at 72; Ex. 21.) Ms. Shumaker testified that the Agency was aware of Heather's plans to terminate the CPO

because she wanted Jason's support in caring for the children. (Tr. at 74.) The Agency was concerned about the situation due to the severity of the prior domestic violence incident. (Tr. at 75.) Ms. Shumaker testified that Open Arms, Domestic Violence and Rape Crisis Services, was also concerned about Heather's safety with respect to dropping the CPO. (Tr. at 74-75.)

{¶10} Ms. Shumaker testified about another location that Heather was asked to leave due to Jason's violent nature and her contact with Jason in spite of the CPO. (*See* Tr. at 109.) With respect to Heather's move to West Virginia, Ms. Shumaker stated,

> According to her uncle in West Virginia, the family wanted to provide her with support and he was even willing to allow her to stay. When she showed up with Mr. Shearer, the family at that time realized this is not what they had intended, because they were helping her escape the problems of Mr. Shearer. And then she ended up showing up in West Virginia with Mr. Shearer.

(Tr. at 110.)

{¶11} Ms. Shumaker testified about a report that the Agency received at the beginning of December 2013, which indicated that Heather returned from West Virginia and that Jason "took the children." (Tr. at 46-47.) The Agency contacted Jason and notified him about their intention to supervise the children and ensure their safety. (Tr. at 47, 49.) The Agency had concerns about Jason "living in a home with a woman that had recently received felony charges of drug possession." (Tr. at 48.) The Agency also had concerns about Jason's "extensive violent

history regarding [Heather,] as well as drug use and criminal history." (Tr. at 48.) Jason was asked to work with the Agency and to undergo "a drug screen." (Tr. at 48-49.) He refused to cooperate. (Tr. at 50.)

{¶12} As a result, on December 13, 2013, the Agency requested removal of the children from the parents' custody and placement of the children with the Agency. (Tr. at 50.) That is when the ex parte motions for emergency temporary custody were filed with the trial court. (*Id.*) Ms. Shumaker explained additional reasons for the emergency motions, which consisted of the fact that Heather "was not able to provide care for the children," as she was homeless at the time and was having contact with Jason, which was perceived as a failure "to provide for her safety." (Tr. at 51.) The orders of emergency temporary custody were granted on December 20, 2013, and the children had remained in the Agency's custody since that time. (Tr. at 54-57.) The children were placed with a foster family. (Tr. at 169.)

{¶13} Ms. Shumaker testified that in February 2014, when the case was heard on the motions for change of disposition, both parents were interested in working with the Agency so that the children could be "reunified into their home." (Tr. at 58.) But both parents eventually stopped "participating actively with the services as indicated on the case plan and there [was] little-to-no contact with either parent." (Tr. at 59.) Therefore, no extensions were granted and in November 2014, the Agency filed motions for permanent custody of D.L.S. and

D.W.S. (Tr. at 59-60.) Ms. Shumaker testified that the motions were based on a claim of abandonment by the father and a claim that "the children cannot and should not be returned to either parent within a reasonable amount of time." (Tr. at 60-61.)

{¶14} Ms. Shumaker testified about the case plan prepared for the family and approved by the court, which included visitation schedules and other services for Jason's involvement. (Tr. at 64-66.) Among other items, the plan indicated that Jason was in need of domestic violence therapy due to his felony conviction for "a severe case of domestic violence" against Heather, as well as other incidents of domestic violence. (Tr. at 67-71.) The Agency referred Jason to Open Arms in Findlay, Ohio, to attend a domestic violence offender's program. (Tr. at 76.) Jason did not complete the program. (Tr. at 77.) The Agency again referred him to a program in Toledo, Ohio, but there was no indication that he ever completed a program there either. (Tr. at 80.) The Agency concluded that Jason had not completed this objective of the case plan. (Tr. at 80.)

{¶15} Jason did not achieve the second objective of the case plan, which was to undergo mental health and substance abuse assessments. (Tr. at 80, 89, 93.) Except for taking one drug test, which was positive for cocaine, Jason did nothing to comply with this objective. (Tr. at 92-93.)

{¶16} Ms. Shumaker testified that Jason failed to achieve the next objective, which was "to cooperate with the Agency and service providers." (Tr.

at 104.)  In particular, Ms. Shumaker stated that Jason did not keep appointments or keep in contact with the caseworker.  When he did attend, he was resistant and "not always corporative."  (Tr. at 105.)  He eventually moved out of state and had not contacted the Agency since July 2014.  (Tr. at 105.)

{¶17} The next objective on the case plan required appropriate housing, which included special accommodations for D.L.S.  (Tr. at 105.)  Ms. Shumaker testified that Jason "did not ever have a safe and stable living environment throughout the life of the case."  (Tr. at 106.)  From the information available to her, it appeared that Jason was in California during the beginning phases of the case.  (Tr. at 112.)  He returned to the area around September or October 2013, but did not become involved in the case until December 2013, when he removed the children from Heather's custody.  (*Id.*)  At that time, he lived with his girlfriend, identified as "Mrs. Green."  (*Id.*)  He later lived with his parents in Findlay, Ohio where he was under house arrest "for a period of time."  (*Id.*)  He then moved in with Heather in Toledo for a while, and after July 2014, he was reported to be working for a traveling carnival.  (*Id.*)  At the time of the hearing, Jason's living situation was unknown.  (Tr. at 23, 113.)  The last time Ms. Shumaker had contact with Jason was in July 2014.  (Tr. at 23.)  Online research indicated that he was in Miami, Florida at some point.  (Tr. at 23.)  The research also indicated that Jason had open cases in the Court of Common Pleas of Wood County, Ohio, and in Findlay Municipal Court, as well as active arrest warrants out of these courts.  (R.

at 23-25.) Ms. Shumaker explained the importance of a stable living situation for the children, especially due to D.L.S.'s "incredible amount of medical needs," which require a feeding tube, wheelchair accessibility, and a specialized bed. (Tr. at 114.) She talked about the importance of the children's safety in their place of residence. (*Id.*) A steady place of residence also had effect on stability in the children's educational services, which included specialized services for D.L.S. (*Id.*) Ms. Shumaker concluded that neither parent satisfied this objective of the case plan. (Tr. at 115.)

{¶18} The next objective on the case plan was providing consistent specialized educational services for D.L.S., due to his developmental issues and the fact that he had not attended school on a regular basis in the past. (Tr. at 115, 116.) His medical conditions required that the school have current medical information on file, as well as current doctor's orders, which had been lacking in the past. (Tr. at 116-118.) Ms. Shumaker listed D.L.S.'s medical conditions, which included cerebral palsy, polycystic kidney disease, seizure disorder, pneumonia, and auditory sensory issues. (Tr. at 116-118.) She testified that D.L.S. had consistency in his education and medical care since he was placed in the Agency's care, but Jason and Heather were not involved in providing it. (Tr. at 118.)

{¶19} The last objective concerned a need for D.W.S.'s developmental assessment and addressing his emotional and behavioral issues. (Tr. at 119.) Ms.

Shumaker testified that these needs were being met by the foster care provider. (Tr. at 120.)

**{¶20}** Ms. Shumaker testified that the case plan provided for parents' visitations with the children. (Tr. at 120.) She stated that the visitations were "sporadic," but the reports indicated that the parents interacted well with the kids. (Tr. at 122.) Jason's last visit with the children was in July 2014. (Tr. at 123.)

**{¶21}** In sum, Ms. Shumaker concluded that Jason and Heather were not compliant with the case plan and they did not take advantage of the assistance opportunities provided to them by the Agency. (Tr. at 126-127.) In her opinion, neither parent "would be able to provide an adequate permanent home for the children in the near future," and an additional amount of time would not change anything in this case. (Tr. at 127.) Further, in her opinion, it was in the best interest of the children that they be placed in the permanent custody of the Agency and not be placed with either parent. (Tr. at 128.) She opined that "a legally secure and permanent placement [was not] achievable without the granting of permanent custody to the Agency." (Tr. at 132.)

**{¶22}** Tabitha Whaley ("Ms. Whaley"), the case manager at Harmony House, a supervised visitation and exchange program, oversaw Jason and Heather's visits with the children. (Tr. at 144-146.) The visits started in February 2014, and she reported around thirty-two of them, with some of the visits only involving one of the parents. (Tr. at 149, 151.) Ms. Whaley indicated that Jason

was taken off the visitation schedule in March 2014, due to being incarcerated at the time. (Tr. at 154.) Ms. Whaley testified that Jason's last visit with the children was in July 2014. (Tr. at 156.) Jason called in August 2014 to cancel the next scheduled visitation and because of multiple cancellations, both parents were placed on a 30-day suspension from visitations. (Tr. at 156.) Jason never resumed visitations after that time. Eventually, both parents ceased to visit the children and there were no visitations occurring as of the time of the hearing. (Tr. at 151.) Ms. Whaley testified that other than the attendance issues, there were no concerns about the parents' visitations with the children. (Tr. at 159.)

{¶23} Matthew Naylor ("Mr. Naylor"), testified that he and his wife had been foster parents for D.L.S. and D.W.S. since December 2013. (Tr. at 169-170.) He described D.L.S. as "an 8-year-old infant," who is wholly dependent on adult's care. (Tr. at 170.) He described the extensive, "minute-to-minute," care that D.L.S. needs daily. (Tr. at 172-174.) Mr. Naylor also listed D.L.S.'s multiple medical providers, including specialists in Toledo, Ohio. (Tr. at 175-178.) He referred to D.L.S.'s frequent hospitalizations. (Tr. at 182.) He described improvement in D.L.S.'s mobility within the past year, resulting from therapy and consistent care. (Tr. at 183-184.) Mr. Naylor stated that when D.L.S. came into his care, he was underweight, his wheelchair was "extremely too small" for him, and he did not have much of other medical equipment needed for his care. (Tr. at 184, 188.) Mr. Naylor indicated that D.L.S.'s future care is "going to be more

extensive," as he grows and becomes heavier to lift. (Tr. at 190.) Mr. Naylor also described care for D.W.S. He testified that D.W.S. was malnourished when he came into his care, and refused to eat anything but cheeseburgers and chicken nuggets. (Tr. at 185.) Mr. Naylor stated that D.W.S. was struggling in kindergarten. (Tr. at 187.)

{¶24} Jane Davis ("Ms. Davis"), testified as the CASA/guardian ad litem for D.L.S. and D.W.S. She indicated that she had had contact with both parents at the very beginning of the case but she had not seen Jason since May or June 2014. (Tr. at 196.) Ms. Davis did not have any information regarding the current whereabouts of either parent, as they had not returned any phone calls that she had made. (Tr. at 196.) Ms. Davis recommended that D.L.S. and D.W.S. be placed in the permanent custody of the Agency. (Tr. at 197.) In support of this recommendation, Ms. Davis stated,

> I have grave concerns about both their safety and their well-being if they were with their parents. The parents have demonstrated violent behavior towards each other in the presence of the boys. They have abused drugs and alcohol in front of the boys. And have -- they're incapable of taking care of particularly [D.L.S.], when they are in this condition. They've neglected [D.L.S.]'s medical needs and they have neglected their own medical needs. Both parents have substantial medical problems, too.

(Tr. at 197.)

{¶25} Attorney Creighton informed the trial court that he had "zero information" about his client, "no address or knowledge of his whereabouts." (Tr.

- 13 -

at 9.) Attorney Creighton stated that Jason had not contacted his office and that the only contact was during one of the prior hearings. (*Id.*) At the end of the proceedings, Attorney Creighton stated, "I would like to reiterate I have had no contact with my client basically since the first court hearing after my appointment despite numerous attempts." (Tr. at 194.)

{¶26} Following the hearing, the trial court issued written judgment entries, in which it terminated Jason and Heather's parental rights and granted permanent custody to the Agency. Jason now appeals the trial court's judgments alleging the following assignments of error.

### ASSIGNMENT OF ERROR ONE:

**THE TRIAL COURT COMMITTED ERROR IN GRANTING PERMANENT CUSTODY OF THE MINOR CHILDREN TO THE STATE OF OHIO.**

### ASSIGNMENT OF ERROR TWO:

**THE STATE DID NOT MEET ITS BURDEN OF PROOF OF A CLEAR AND CONVINCING EVIDENCE STANDARD**

### ASSIGNMENT OF ERROR THREE:

**THE TRIAL COUNSEL FOR THE APPELLANT WAS INEFFECTIVE AND AS SUCH, THE APPELLANT WAS DENIED THE FUNDAMENTAL RIGHT TO COUNSEL**

***First and Second Assignments of Error—Grant of the Agency's Motion for
Permanent Custody***

**{¶27}** In the first and second assignments of error, Jason contends that the
trial court erred in granting the Agency's motions for permanent custody of D.L.S.
and D.W.S. He demands reversal due to two reasons. First, Jason argues that he
"was not given a significant opportunity to comply with case plan goals and
objectives" because there were no extensions of the case. (App't Br. at 12.)
Second, he claims "that the award of permanent custody to the State in this case
was not sufficient to meet the burden of clear and convincing evidence." (*Id.* at
15.) Of note, neither allegation is supported by "the reasons in support of the
contentions, with citations to the authorities, statutes, and parts of the record on
which appellant relies," as required by App.R. 16(A)(7). The arguments in
support of the two assignments of error consist of several-paragraph-long
summaries of legal standards in permanent custody cases, followed by one- or
two-sentence conclusory statements in support of reversal. (*See* App't Br. at 11-
15.) App.R. 12(A)(2) allows this court to "disregard an assignment of error
presented for review" for failure to "identify in the record the error on which the
assignment of error is based." In the interest of justice, we elect to review the two
assignments of error at this time, addressing them together.

**{¶28}** Before a juvenile court may terminate parental rights and award
permanent custody of a child to a proper moving agency, it must find clear and

convincing evidence of both prongs of the permanent custody test, as required under R.C. 2151.414(B). *See In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 9 (2004). The first prong of the test requires a finding by clear and convincing evidence that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been previously repeatedly adjudicated abused, neglected, or dependent; or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E). R.C. 2151.414(B)(1); R.C. 2151.414(B)(2). "If the trial court determines that *any* provision enumerated in R.C. 2151.414(B)(1) applies," it must proceed to the second prong of the test, which requires the trial court to "determine, by clear and convincing evidence, whether granting the agency permanent custody of the child is in the child's best interest," based on an analysis under R.C. 2151.414(D). (*Emphasis sic.*) *In re A.F.*, 3d Dist. Marion No. 9-11-27, 2012-Ohio-1137, ¶ 55; *see* R.C. 2151.414(B)(1).

{¶29} When reviewing the trial court's decision in a permanent custody case, we " 'must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof.' " *In re B.B.*, 3d Dist. Defiance No. 4-10-17, 2012-Ohio-2695, ¶ 33, quoting *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985). "A court's decision to terminate

parental rights will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which a court can determine by clear and convincing evidence that the essential statutory elements for a termination of parental rights have been established." *In re A.E.*, 3d Dist. Seneca Nos. 13-14-14 and 13-14-15, 2014-Ohio-4540, ¶ 28. "Clear and convincing evidence is more than a preponderance of the evidence but not as much evidence as required to establish guilt beyond a reasonable doubt * * * in a criminal case; rather, it is evidence which provides the trier of fact with a firm belief or conviction as to the facts sought to be established." *In re H.M.K.*, 3d Dist. Wyandot Nos. 16-12-15 and 16-12-16, 2013-Ohio-4317, ¶ 42.

{¶30} In the case sub judice, the trial court found that the first prong of the permanent custody test was satisfied because D.L.S. and D.W.S. could not be placed with either parent within a reasonable time or should not be placed with either parent. (R. at 57, ¶ 3.) This finding satisfied provision (a) of R.C. 2151.414(B)(1). In making this determination, the trial court explicitly relied upon its consideration of R.C. 2151.414(E), which states that if one or more of the provisions of R.C. 2151.414(E)(1)-(16) "exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent." R.C. 2151.414(E). The trial court particularly found by clear and convincing evidence that

the children's parents have demonstrated a lack of commitment toward the children by abandoning the child [sic] and failing to regularly support, visit or communicate with the children. The present whereabouts of either parent is unknown. Mother's last contact with the agency was in November of 2014 and father in July of that year. Mother's last visit was in July of 2014 and Father in July, 2014. Father presently has an outstanding bench warrant from Findlay Municipal Court and an outstanding indictment from the Wood County Court of Common Pleas for Receiving Stolen Property. Mother has been a victim of Domestic Violence at the hands of the father but mother only attended 3 of 26 sessions in her case plan mandated Domestic Violence Program. Father refused to attend any sessions.

(R. at 57, ¶ 5.) The above findings of the trial court implicate the following subsections of R.C. 2151.414(E): (1) failure to remedy conditions despite reasonable case planning; (4) lack of commitment; (10) abandonment; and (16) "[a]ny other factor the court considers relevant." R.C. 2151.414(E). Therefore, the trial court's findings satisfy several factors listed in R.C. 2151.414(E). We further hold that these findings are supported by sufficient evidence to allow for a finding by the clear and convincing standard.

{¶31} Regarding the second prong of the permanent custody test, whether a grant of permanent custody is in a child's best interest, the trial court is required to consider all relevant factors listed in R.C. 2151.414(D)(1), as well as any other relevant factors. *In re H.M.*, 2014-Ohio-755, 9 N.E.3d 470, ¶ 27 (3d Dist.). The factors of R.C. 2151.414(D)(1) include: " 'the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers, and out-of-home providers; the wishes of the child; the custodial history of the child; the

child's need for legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency' "; and whether any of the factors in divisions (E)(7)-(11) apply. *Id.*, quoting *In re B.S.,* 184 Ohio App.3d 463, 2009-Ohio-5497, 921 N.E.2d 320, ¶ 46 (8th Dist.); *accord* R.C. 2151.414(D). The trial court in the instant case stated that it had considered all the relevant factors as required by R.C. 2151.414(D). In particular, the court stated that it had considered provisions (E)(7) to (11) of R.C. 2151.414, as well as

> the relationship of the children with their parents, relatives, foster parents, out-of home providers and other people who may significantly affect the children's need for legally secure permanent placement and the probability that this type of placement can be achieved only through the granting of permanent custody to CPSU. Both children have special needs and particularly [D.L.S.] who requires almost constant medical attention from the foster family and has a bleak prognosis. It is doubtful that even if the natural parents were to resurface and overcome their substance addiction that they could provide the time or intensive care that these children require.

(R. at 57, ¶ 4.)

{¶32} Our review of the record reveals that there was sufficient evidence to support these findings by the clear and convincing standard. Jason's claim on appeal that he "was not given a significant opportunity to comply with case plan goals and objectives" because there were no extensions of the case, has no merit. (App't Br. at 12.) "R.C. Chapter 2151 evidences a clear purpose in preventing children from languishing in the foster care system for years." *In re C.C.*, 12 Dist.

Warren Nos. CA2011-11-113, CA2011-11-127, 2012-Ohio-1291, ¶ 33. Due to Jason's failure to appear at the majority of the court's hearings, scheduled appointments with the caseworker, or visits with the children, any extensions would be futile and detrimental to the purpose of R.C. Chapter 2151. When Jason was given an "extension" on the hearing date upon his request in November 2013, he failed to appear at the rescheduled hearing. Furthermore, Ms. Shumaker testified about opportunities given to Jason to comply with the case plan and about Jason's failure to take advantage of the assistance provided to him by the Agency.

{¶33} We conclude that the record supports the trial court's determination that (1) D.L.S. and D.W.S. cannot be placed with either parent within a reasonable time or should not be placed with either parent, and that (2) granting the Agency's motions for permanent custody is in the best interest of the children. Accordingly, we overrule the first and second assignments of errors.

### *Third Assignment of Error—Ineffective Assistance of Counsel*

{¶34} In the third assignment of error, Jason raises an ineffective assistance of counsel claim. Section 2151.352 of the Revised Code provides that parents are guaranteed the right to counsel at all stages of a permanent custody proceeding. *In re C.H.*, 162 Ohio App.3d 602, 2005-Ohio-4183, 834 N.E.2d 401, ¶ 9 (3d Dist.); *In re Moore*, 153 Ohio App.3d 641, 2003-Ohio-4250, 795 N.E.2d 149, ¶ 28 (3d Dist.). This right to counsel includes the right to effective assistance of counsel. *Moore* at ¶ 28; *In re Brooks*, 10th Dist. Nos. 04AP-164, 04AP-202, 04AP-165,

04AP-201, 2004-Ohio-3887, ¶ 24. In permanent custody proceedings, where parents face losing their children, we apply the same test as the test for ineffective assistance of counsel in criminal cases announced in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Ohio Supreme Court in *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). *Moore* at ¶ 29.

{¶35} In order to prevail on a claim of ineffective assistance of counsel, a criminal defendant must first show that the counsel's performance was deficient in that it fell "below an objective standard of reasonable representation." *State v. Keith*, 79 Ohio St.3d 514, 534, 684 N.E.2d 47 (1997). Second, the defendant must show "that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *Id.*, citing *Strickland* at 687. In order to demonstrate prejudice, the defendant must prove a reasonable probability that the result of the trial would have been different but for his or her counsel's errors. *Id.* In applying these standards, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 108, quoting *Strickland* at 669. Therefore, the court must be highly deferential in its scrutiny of counsel's performance. *State v. Walker*, 90 Ohio App.3d 352, 359, 629 N.E.2d 471 (3d Dist.1993), quoting *Strickland* at 689.

**{¶36}** Jason's argument under this assignment of error consists of the following three sentences in his appellate brief: "Trial counsel failed to object to any testimony. Such a failure left a significant portion of the evidence untested and untried. * * *[2] Therefore, due to trial counsel's ineffectiveness, the decision of the trial court should be reversed and the matter remanded for a new trial." (App't Br. at 16.) Jason does not substantiate any claim that he was prejudiced by his trial counsel's performance at the permanent custody hearing or that the outcome would have been different but for trial counsel's performance. Accordingly, Jason has not satisfied his burden in proving his trial counsel's ineffectiveness. *See In re C.W.*, 3d Dist. Wyandot No. 16-09-26, 2010-Ohio-2157, ¶ 30 (rejecting a claim of ineffective assistance for failure "to call Mother as a witness or present any other evidence," where Mother "ha[d] not presented any argument as to what her testimony would have been, what other evidence there was to present, or how the outcome of the proceeding would have been different if she had testified or other evidence had been presented").

**{¶37}** Therefore, we overrule the third assignment of error.

---

[2] Although Jason also adds the following statement, "A cross examination is the only means by which this could be accomplished and failure to do to [sic] renders any hearing unreliable," he does not allege any error or prejudice stemming from the trial counsel's failure to cross-examine. (App't Br. at 16.) *See In re Shores*, 3d Dist. Allen, Nos. 1-07-16, 1-07, 17, 2007-Ohio-5193, ¶ 27-32 (rejecting a claim of ineffective assistance of counsel for failure to cross-examine); *see also In re C.W.,* 3d Dist. Wyandot No. 16-09-26, 2010-Ohio-2157, ¶ 27 ("An attorney's decision not to cross-examine a witness falls within the category of tactical or strategic trial decisions.").

*Conclusion*

**{¶38}** Having reviewed the arguments, the briefs, and the record in this case, we find no error prejudicial to Appellant in the particulars assigned and argued. The judgments of the Hancock County Court of Common Pleas, Juvenile Division, are therefore affirmed.

***Judgments Affirmed***

**SHAW and PRESTON, J.J., concur.**

**/hlo**