[Cite as *In re W.W.E.*, 2016-Ohio-4552.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In re: | : | |
| [W.W.E. | : | No. 15AP-167 |
| | : | (C.P.C. No. 12JU-869) |
| W.E., | : | |
| | : | (REGULAR CALENDAR) |
| Appellant]. | : | |
| | : | |

D E C I S I O N

Rendered on June 23, 2016

**On brief:** *Giorgianni Law LLC*, and *Paul Giorgianni*, for appellee W.W.E.

**On brief:** *Jennifer M. Riley* and *Robert J. McClaren*, for appellee Franklin County Children Services.  **Argued:** *Robert J. McClaren.*

**On brief:** *Yeura R. Venters*, Public Defender, and *Timothy E. Pierce*, for appellant.  **Argued:** *Timothy E. Pierce.*

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

PER CURIAM.

{¶ 1} Appellant, W.E., appeals from the February 13, 2015 judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, which denied appellant's motion for custody and granted permanent custody of W.W.E., appellant's son, to Franklin County Children Services ("FCCS") for purposes of adoption.

## I. Facts and Procedural History

{¶ 2} W.W.E. was born in January 2006. On January 20, 2012, FCCS filed a complaint alleging that W.W.E. was an abused, neglected, or dependent child, and requesting temporary custody pursuant to R.C. 2151.353. Specifically, the complaint alleged that W.W.E. was residing with his mother, L.E., at a known location; however, the whereabouts of appellant were listed as "unknown." (Compl. at 1.) The complaint listed a variety of factual circumstances in support of the allegations of abuse, neglect, and dependency, including, among others, that L.E. had struck W.W.E., L.E. used illegal drugs in W.W.E.'s presence, L.E. often left W.W.E. unsupervised, the family's home was unclean, and W.W.E. was absent from school on numerous occasions without excuse. Several reports were catalogued of various injuries to W.W.E.'s face and head. Additionally, within one hour of signing a safety plan, L.E. violated it by leaving W.W.E. at home alone. On the same date the complaint was filed, a magistrate appointed by the trial court filed an emergency care order granting emergency custody of W.W.E. to FCCS.

{¶ 3} On January 23, 2012, the magistrate held a hearing at which neither appellant nor L.E. were present. On the same date, the magistrate filed an order granting temporary custody of W.W.E. to FCCS.

{¶ 4} On February 22, 2012, the magistrate held a hearing at which neither appellant nor L.E. were present. Although L.E.'s counsel was at the hearing, the magistrate permitted him to withdraw since L.E. was not present. The magistrate found W.W.E. to be an abused, neglected, and dependent minor child and granted temporary custody of W.W.E. to FCCS. Furthermore, the magistrate approved and adopted the case plan prepared by FCCS. The case plan ordered L.E. to address her substance abuse issues and implement skills she learned in parenting classes. The case plan stated the following:

> [L.E.] reports that father [appellant] is not involved in his son's life but sporadically has phone contact with [W.W.E.]. She reports not knowing where he lives and having no contact information for him. It is unclear to what degree there is attachment or bonding between [W.W.E.] and [appellant]. [L.E.] reports that [appellant] does not pay child support or provide for [W.W.E.] in any way.

(Case Plan at 6.)  On February 29, 2012, the magistrate filed a decision memorializing the orders issued at the February 22, 2012 hearing.  On the same date, the trial court adopted the magistrate's decision.

{¶ 5}   On July 20, 2012, FCCS filed a semi-annual review of the case.  The review stated that there had been no contact with appellant.

{¶ 6}   On November 27, 2012, FCCS filed a motion for first extension of temporary custody.  In its memorandum in support of its motion, FCCS stated that appellant had "failed to make himself available for case plan objectives towards reunification with [W.W.E.]." (Mot. at 3.)   Furthermore, FCCS stated that appellant "has absolutely no contact with the service team or with [W.W.E].   [Appellant] has never visited with [W.W.E.].  [Appellant] has abandoned this child."  (Mot. at 3.)

{¶ 7}   On January 10, 2013, FCCS filed a semi-annual review of the case in which it again reported that there had been no contact from appellant.

{¶ 8}   On January 18, 2013, the magistrate held a hearing on FCCS's motion for first extension of temporary custody.  L.E. was in attendance at the hearing, but appellant was not present.  On February 1, 2013, the magistrate filed a decision granting FCCS's motion for an extension of temporary custody.  On the same date, the trial court filed a judgment entry adopting the magistrate's decision.

{¶ 9}   On June 12, 2013, FCCS filed a motion for permanent custody of W.W.E. pursuant to R.C. 2151.413 and 2151.414. In its motion, FCCS reiterated that appellant "failed to make himself available for case plan services toward reunification with [W.W.E.]." (Mot. at 5.)   Furthermore, FCCS stated that appellant "has had no contact with [W.W.E.] since the time of case opening and only recently made contact with the service team. [Appellant] has abandoned [W.W.E.]."  (Mot. at 5.)

{¶ 10}  On July 10, 2013, FCCS filed a semi-annual review of the case in which it reported that contact had been established with appellant.  According to the report, appellant stated that "he was living with [L.E.] during the time [W.W.E.] was removed from the home, and knew of her drug use and how this affected her parenting, he reported concerns of [W.W.E.] being unsupervised due to [L.E.'s] use."  (July 10, 2013 Semi-Annual Review at 2, hereinafter "SAR.")  Furthermore, appellant stated that "he last had contact with [W.W.E.] during a visit [W.W.E.] had with [L.E.] last week, where she called

[appellant] and he talked to [W.W.E.] on the phone for an hour."  (July 10, 2013 SAR at 2.)

{¶ 11} On July 17, 2013, the date on which the trial court was scheduled to hold a hearing on FCCS's motion for permanent custody, appellant appeared and filed a request for a continuance in order to obtain counsel.  On the same date, appellant filed a motion for legal custody.  On July 18, 2013, the trial court filed an order granting appellant's request for a continuance to obtain counsel.  On July 31, 2013, the magistrate filed an entry appointing counsel for appellant, finding that appellant was without the funds to retain an attorney.

{¶ 12} On August 19, 2013, the magistrate held a hearing at which appellant was present.  At the hearing, FCCS opposed appellant's motion for legal custody, stating that he failed to become involved in the case from its inception until June 2013.  FCCS recommended that the court order an Interstate Compact on the Placement of Children ("ICPC") investigation since appellant resided in Kentucky.  The guardian ad litem for W.W.E. also recommended that the court order an ICPC investigation.  Furthermore, the guardian ad litem stated that FCCS had only permitted appellant to visit W.W.E. once since "he had refused to give them contact information for while he was in town for them to set up additional visits."  (Aug. 19, 2013 Tr. at 4.)

{¶ 13} On December 31, 2013, FCCS filed a semi-annual review of the case. In the review, FCCS stated the following:

> In June 2013 [appellant] contacted service team from Kentucky expressing his desire to care for [W.W.E.] and get custody of him. Service team has explained to [appellant] that he will need to complete the Case Plan in order to work on reunification. An ICPC will be completed. Since then [appellant] has had one visit with [W.W.E.]. He has remained in Ohio since then and has refused to communicate with service team where he is staying or his contact information. [Appellant] does not understand why he cannot just pick up [W.W.E.] and take him to Kentucky.

(Dec. 31, 2013 SAR at 2.)  Additionally, FCCS noted that appellant had not visited W.W.E. during the review period.

{¶ 14} On June 24, 2014, FCCS filed a semi-annual review of the case.  In the review, FCCS stated that "[t]here was an ICPC for [appellant], this was denied by the state

of [Kentucky]. [Appellant] does not consistently keep [in] contact with the caseworker or have regular visitation with his son." (June 24, 2014 SAR at 2.)

{¶ 15} On September 16, 2014, W.W.E.'s guardian ad litem filed a report pursuant to R.C. 2151.414(C). The report contained the following statement:

> [Appellant] came to Columbus for one hearing in July, 2013 and had one visit. He has not returned to Columbus for any additional visits with his son. The case worker from FCCS reported that the agency has offered to assist [appellant] by offering to pay for bus tickets for him to come to Columbus, but he did not utilize that assistance.

(Sept. 16, 2014 Report at 2.)

{¶ 16} On September 24, 2014, the trial court was scheduled to hold a trial on FCCS's motion for permanent custody and appellant's motion for legal custody. However, due to issues with providing service to L.E., the trial court determined that it would continue the matter. Before ordering the continuance, the trial court afforded the parties an opportunity to speak on the record:

> [The Court]: Anyone else like to speak --
>
> [Appellant]: Yes.
>
> [The Court]: -- for the record? You are represented by counsel. Your counsel may speak for the record.
>
> [Appellant's Counsel]: Well, Your Honor, my client also would like to note his objection for the --
>
> [Appellant]: I'm just going to go out there and talk to my dad.
>
> [Appellant's Counsel]: Hold on.
>
> [Appellant]: It ain't doing me no good to be here. I can't talk to nobody. You don't talk for me.
>
> [Appellant's Counsel]: My client is leaving the courtroom, unfortunately. I've had no communication with my client until today for the past year. He is objecting to the continuance.
>
> [The Court]: Uh-hum (affirmative response).
>
> [Appellant's Counsel]: He would like his motion to be heard.
>
> [The Court]: Uh-hum (affirmative response).

> [Appellant's Counsel]: On the other hand, I don't recommend that. My recommendation to him is to continuously work his case plan, but we seem to be at odds with that.
>
> [The Court]: Uh-hum (affirmative response).
>
> [Appellant's Counsel]: But that's what's happening today on my side, thank you.
>
> [The Court]: Thank you.

(Sept. 24, 2014 Tr. at 5-6.)

{¶ 17} On September 25, 2014, a waiver of summons and notice of hearing that was signed by L.E. was filed in the trial court, reflecting that L.E. acknowledged receipt of the June 12, 2013 motion for permanent custody and that notice was provided of the hearing on such motion to be held on February 3, 2015.

{¶ 18} On December 15, 2014, FCCS filed a semi-annual review of the case. It noted that appellant continued to reside in Kentucky, he had not visited W.W.E. since July 2013, and that the ICPC investigation denied placement of W.W.E. with appellant.

{¶ 19} On February 3 and 10, 2015, the trial court held a hearing regarding appellant's motion for legal custody and FCCS's motion for permanent custody. On February 3, 2013, at the beginning of the proceedings, the court noted that appellant wished to terminate his representation by counsel. After a discussion between the court, appellant, and appellant's counsel, the court granted appellant's request to proceed pro se in part, ordering appellant's counsel to remain as standby counsel. The trial court noted that L.E. was not present at the hearing. After L.E.'s counsel confirmed that L.E. was aware of the date of the commencement of trial and presented the court with a waiver of service signed by L.E., the trial court granted L.E.'s counsel permission to withdraw.

{¶ 20} On February 13, 2015, the trial court filed a decision and judgment entry denying appellant's motion for legal custody and granting FCCS's motion for permanent custody.

## II. Assignments of Error

{¶ 21} Appellant appeals and assigns the following three assignments of error for our review:

> [I.] Appellant's waiver of his right to the assistance of counsel was not knowingly, intelligently, and voluntarily

entered in violation of the Fourteenth Amendment of the United States Constitution, Article I, Sections 1 and 16 of the Ohio Constitution, R.C. 2151.352 and Juv.R. 4(A).

[II.] The trial court erred in admitting at trial the Interstate Compact for the Placement of Children Report (ICPC) inasmuch as it did not qualify as a public record under Evid.R. 803(8), nor had it been properly authenticated for evidentiary purposes under Evid.R. 901 and 902 and Civ.R. 44(A)(1).

[III.] The lower court's decision awarding permanent custody of the child to Franklin County Childrens Services was against the manifest weight of the evidence.

For ease of discussion, we consider appellant's assignments of error out of order.

## III. Discussion

### A. First Assignment of Error—Waiver of Counsel

{¶ 22} In his first assignment of error, appellant asserts that his waiver of his right to counsel was not knowingly, intelligently, and voluntarily entered in violation of the Fourteenth Amendment of the United States Constitution, and the Ohio Constitution, Article I, Sections 1 and 16.

{¶ 23} "The right to parent one's children is a fundamental right." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28, citing *Troxel v. Granville*, 530 U.S. 57, 66 (2000). *See also In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ("[T]he right to raise one's children is an 'essential' and 'basic civil right.' "). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Murray* at 157, quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). "Permanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' Therefore, parents 'must be afforded every procedural and substantive protection the law allows.' " *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991).

{¶ 24} However, the state has broad authority to intervene to protect children from abuse and neglect. *C.F.* at ¶ 28, citing R.C. 2151.01. An award of permanent custody, which terminates parental rights, is an " 'alternative of last resort and is only justified when it is necessary for the welfare of the children.' " *In re C.G.*, 10th Dist. No. 13AP-632,

2014-Ohio-279, ¶ 28, quoting *In re Swisher*, 10th Dist. No. 02AP-1408, 2003-Ohio-5446, ¶ 26.

{¶ 25} Pursuant to R.C. 2151.352, parents are guaranteed the right to counsel at all stages of a permanent custody proceeding. Specifically, R.C. 2151.352 provides in pertinent part:

> A child, the child's parents or custodian, or any other person in loco parentis of the child is entitled to representation by legal counsel at all stages of the proceedings under this chapter or Chapter 2152. of the Revised Code. If, as an indigent person, a party is unable to employ counsel, the party is entitled to have counsel provided for the person * * * . If a party appears without counsel, the court shall ascertain whether the party knows of the party's right to counsel and of the party's right to be provided with counsel if the party is an indigent person. The court may continue the case to enable a party to obtain counsel, to be represented by the county public defender or the joint county public defender, or to be appointed counsel upon request pursuant to Chapter 120. of the Revised Code.

{¶ 26} Similarly, Juv.R. 4(A) provides:

> Every party shall have the right to be represented by counsel and every child, parent, custodian, or other person in loco parentis the right to appointed counsel if indigent. These rights shall arise when a person becomes a party to a juvenile court proceeding. When the complaint alleges that a child is an abused child, the court must appoint an attorney to represent the interests of the child. This rule shall not be construed to provide for a right to appointed counsel in cases in which that right is not otherwise provided for by constitution or statute.

{¶ 27} In *State ex rel. Heller v. Miller*, 61 Ohio St.2d 6 (1980), the Supreme Court of Ohio found that "[i]n actions instituted by the state to force the permanent, involuntary termination of parental rights, the United States and Ohio Constitutions' guarantees of due process and equal protection of the law require that indigent parents be provided with counsel and a transcript at public expense for appeals as of right." *Id.* at paragraph two of the syllabus. Furthermore, the court explained:

> [T]he right of personal choice in family matters, including the right to live as a family unit, is a fundamental due process

> right. Cases involving the involuntary, permanent termination of parental rights are unique. In these cases, the parents are in the position of protecting this fundamental due process right for both themselves and the child. Failure to give indigent parents an effective right of appeal when other parents are given such a right impinges on both their own and the child's fundamental interests under the equal protection and due process clauses.

*Id.* at 13.

{¶ 28} Approximately one year after the Supreme Court issued *Heller*, the United States Supreme Court decided *Lassiter v. Dept. of Social Servs.*, 452 U.S. 18 (1981). In *Lassiter*, the United States Supreme Court examined whether the United States Constitution required the appointment of counsel for indigent parents in a parental rights termination proceeding. In its consideration of the question, the court stated that "[t]he pre-eminent generalization that emerges from this Court's precedents on an indigent's right to appointed counsel is that such a right has been recognized to exist only where the litigant may lose his physical liberty if he loses the litigation." *Id.* at 25. However, the court also noted that state "courts have generally held that the State must appoint counsel for indigent parents at termination proceedings." *Id.* at 30, citing *Heller*.

{¶ 29} To determine whether the interests at stake in the context of a termination of parental rights proceeding overcame the presumption that there is no right to appointed counsel in the absence of a potential deprivation of physical liberty, the United States Supreme Court considered the three factors under the test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976). From its examination of these factors, the United States Supreme Court found that the United States Constitution does not require the appointment of counsel for indigent parents in every parental status termination proceeding. *Lassiter* at 31. In conclusion, the court held that "[w]e therefore adopt the standard found appropriate in *Gagnon v. Scarpelli*,[1] and leave the decision whether due process calls for the appointment of counsel for indigent parents in termination

---

[1] In *Gagnon v. Scarpelli*, 411 U.S. 778 (1973), the court declined to hold that indigent probationers have an absolute right to counsel at revocation hearings, finding that the question should be "made on a case-by-case basis in the exercise of a sound discretion by the state authority charged with responsibility for administering the probation and parole system." *Id.* at 790. *See In re G.S.*, 10th Dist. No. 10AP-734, 2011-Ohio-2487, ¶ 13, fn. 2.

proceedings to be answered in the first instance by the trial court, subject, of course, to appellate review." *Id.* at 31-32.

{¶ 30} The Supreme Court of Ohio discussed *Lassiter* in the context of determining whether an indigent parent had a constitutional right to counsel at all meaningful stages of parental neglect proceedings. *In re Miller*, 12 Ohio St.3d 40 (1984). The court affirmed that "the United States Supreme Court held that the Due Process Clause of the Fourteenth Amendment to the United States Constitution does not require the appointment of counsel for indigent parents in every parental status termination proceeding, although [it recognized] that such appointment was required in certain states, including Ohio." *Id.* at 41-42. Nevertheless, in *Miller*, the Supreme Court of Ohio appeared to continue to recognize the validity of the rule announced in *Heller* in proceedings involving the permanent termination of parental rights. *Miller* at 42 ("Appellant was represented by counsel at the permanent termination hearing, as required by *Heller*, *supra*. Having been represented by counsel, there is no reason why she should not have been aware of her right to an appeal."). *See also In re Baby Girl Baxter*, 17 Ohio St.3d 229, 232 (1985), citing *Heller* ("Furthermore, this court has held that the state must appoint counsel for indigent parents at parental termination proceedings.").

{¶ 31} Apart from the constitutional right to counsel recognized in *Heller*, the Supreme Court of Ohio has recognized the statutory right to counsel. In *State ex rel. Asberry v. Payne*, 82 Ohio St.3d 44 (1998), the Supreme Court of Ohio stated that "Ohio, through R.C. 2151.352, provides a statutory right to appointed counsel that goes beyond constitutional requirements." *Asberry* at 46. Furthermore, the Supreme Court of Ohio in *In re Williams*, 101 Ohio St.3d 398, 2004-Ohio-1500, examined whether a child who is the subject of a proceeding to terminate parental rights is a party to that proceeding and, therefore, is entitled to counsel under R.C. 2151.352. In that case, the court cited to *Lassiter* "[f]or discussions of the requirements of the Due Process Clause of the Fourteenth Amendment to the United States Constitution regarding the right to counsel in juvenile court proceedings." *Williams* at ¶ 15. The court held that "pursuant to R.C. 2151.352, as clarified by Juv.R. 4(A) and Juv.R. 2(Y), a child who is the subject of a juvenile court proceeding to terminate parental rights is a party to that proceeding and, therefore, is entitled to independent counsel in certain circumstances." *Id.* at syllabus.

{¶ 32} This court in *In re G.S.*, 10th Dist. No. 10AP-734, 2011-Ohio-2487, applied *Lassiter* to find that the parent's "due process rights were not violated." *G.S.* at ¶ 19. *G.S.*, however, did not specifically address the Ohio Constitution, but, rather, referred generally to "constitutional" rights as the appellant in that case did in her assignment of error. Furthermore, in a subsequent case, we have referred to a constitutional right to counsel. *In re A.P.*, 10th Dist. No. 14AP-23, 2014-Ohio-5244, ¶ 17 ("The total, irreversible elimination of parental rights triggers constitutional protection and entitles an indigent parent to waiver of fees and/or assistance of appointed counsel."); *see also In re Holt*, 10th Dist. No. 03AP-355, 2003-Ohio-5580, ¶ 14 (finding that "an individual's right to counsel in juvenile court proceedings that *do not involve* termination of parental rights is statutory, and is not derived from the United States or Ohio Constitutions"). (Emphasis added.)

{¶ 33} First, we address the contention made by W.W.E. that there is "no absolute ***constitutional*** right—neither federal nor state—to appointed counsel in parental-rights cases." (Emphasis sic.) (W.W.E.'s Second Brief at 4.)[2] In support of this contention, W.W.E. cites to *Lassiter* and states that "[p]rior to *Lassiter*, the Supreme Court of Ohio had held in [*Heller*] that both the federal and state constitutional guarantees of due process and equal protection guaranteed to parents appointed counsel in termination-of-parental-rights cases." (W.W.E.'s Second Brief at 5, fn. 1.) Furthermore, W.W.E. argues that since "[t]hose Ohio constitutional provisions are congruent with their federal analogs * * *. Therefore, one would predict that the Ohio high court, if presented with the question, would overrule *Heller*." (W.W.E.'s Second Brief at 5, fn. 1.) However, W.W.E. also noted that in *Miller*, the Supreme Court of Ohio "seemingly appl[ied] *Heller* despite acknowledging *Lassiter*." (W.W.E.'s Second Brief at 5, fn. 1.)

{¶ 34} As previously noted, the Supreme Court of Ohio based its ruling in *Heller* on both the "United States *and Ohio* Constitutions' guarantees of due process and equal protection of the law." (Emphasis added.) *Id.* at paragraph two of the syllabus. It is clear in light of *Lassiter* that there is no absolute federal constitutional right to counsel for indigent parents in a parental rights termination proceeding; rather, such considerations

---

[2] FCCS makes a similar contention in its brief, arguing that "[t]here is no constitutional right to appointed counsel in a permanent custody proceeding." (FCCS's Second Brief at 5.)

must be examined by the trial court on a case-by-case basis. However, *Lassiter* also explicitly acknowledged *Heller* as recognizing a right beyond what was required by the United States Constitution. *See Lassiter* at 30. Furthermore, the Supreme Court of Ohio has not overruled *Heller* or explicitly modified its holding. Finally, in *Miller* the Supreme Court of Ohio acknowledged the holding in *Lassiter*, yet still noted that the appellant therein "was represented by counsel at the permanent termination hearing, *as required by Heller*." (Emphasis added.) *Miller* at 42. Therefore, considering *Lassiter's* acknowledgement of Ohio's constitutional right pursuant to *Heller*, as well as *Miller's* application of *Heller* post-*Lassiter*, we shall continue to apply *Heller* and find that under the Ohio Constitution a right exists for an indigent parent to be appointed counsel as of right in a permanent custody proceeding. *A.P.* at ¶ 17; *Holt* at ¶ 14. *See generally Coniglio v. State Med. Bd. of Ohio*, 10th Dist. No. 07AP-298, 2007-Ohio-5018, ¶ 8 (noting that "[w]e, as an appellate court, are [bound] to follow binding precedent from the Supreme Court of Ohio"); *State v. McCoy*, 1st Dist. No. C-090599, 2010-Ohio-5810, ¶ 62; *State v. Burke*, 10th Dist. No. 04AP-1234, 2005-Ohio-7020, ¶ 26.

{¶ 35} Next, we examine appellant's contention that his right to counsel was violated because he did not knowingly, intelligently, and voluntarily waive such right.

{¶ 36} Generally, "[t]he right of self-representation has been addressed almost exclusively in the criminal context and its expression in the United States Constitution has been traced to the structure and spirit of the Sixth Amendment." *In re Bowens*, 11th Dist. No. 92-A-1711 (Nov. 9, 1995), citing *Faretta v. California*, 422 U.S. 806, 818 (1975). However, it has been recognized in the context of a parental termination proceeding that an indigent parent who is entitled to the appointment of counsel may waive such right. *Bowens* (specifically acknowledging *Heller* and the right to counsel conferred by the Ohio Constitution and finding that where "an individual's interests in a trial court proceeding are such as to constitutionally require the availability of counsel at state expense, it would be a violation of fundamental fairness to force a lawyer upon the individual."). Furthermore, when reviewing a waiver of the right to counsel in the context of a permanent termination of parental rights, courts in Ohio have examined whether the waiver was knowingly, intelligently, and voluntarily made. *See In re Lander*, 12th Dist. No. CA99-05-096 (June 26, 2000); *In re S.S.*, 9th Dist. No. 10CA0010, 2010-Ohio-6374,

¶ 42; *In re Saunders*, 5th Dist. No. 2006-CA-00131 (Feb. 1, 2007); *In re Z.Y.*, 8th Dist. No. 86293, 2006-Ohio-300, ¶ 32 (applying a totality of the circumstances test to find that a parent in a permanent custody proceeding knowingly and voluntarily waived right to counsel); *In re Moore*, 153 Ohio App.3d 641, 2003-Ohio-4250, ¶ 21 (3d Dist.); *In re Dickerson*, 4th Dist. No. 1529 (June 2, 1982); *In re Walling*, 1st Dist. No. C-040745, 2005-Ohio-1558, ¶ 11; *Bowens*.

{¶ 37} In the criminal context, in order for a waiver of the right to counsel to be recognized, a "trial court must 'make sufficient inquiry to determine whether defendant fully understands and intelligently relinquishes that right.' " *State v. Bowman*, 10th Dist. No. 06AP-149, 2006-Ohio-6146, ¶ 41, quoting *State v. McQueen*, 124 Ohio App.3d 444, 446 (10th Dist.1997), citing *State v. Gibson*, 45 Ohio St.2d 366 (1976). We have stated that "[a]lthough a defendant does not need to have the skill and experience of a lawyer in order to competently and intelligently forego representation, the court must make the defendant aware of the dangers and disadvantages of self-representation." *Id.* at ¶ 42, citing *State v. Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, ¶ 38.

{¶ 38} As noted by the United States Supreme Court in *Lassiter*, however, there are differences between criminal cases in which "the litigant may lose his physical liberty if he loses the litigation" and cases involving the termination of parental rights. *Id.* at 25. In Ohio, discussing both the statutory and constitutional rights to counsel, courts have found under certain circumstances that parents subject to termination of rights proceedings have waived the right to counsel. *In re Tyler Jo S.*, 6th Dist. No. L-04-1294, 2005-Ohio-1225, ¶ 31 (finding that a parent's right to counsel in a termination of rights proceeding was not "absolute" since a parent "can, under certain circumstances, be found to have waived the right to counsel, in which case a court may properly grant a request by counsel to withdraw"); *In re I.D.*, 7th Dist. No. 09 CO 13, 2009-Ohio-6805, ¶ 23; *G.S.* at ¶ 7 ("While parents involved in permanent custody proceedings are entitled to the effective assistance of counsel, as provided in R.C. 2151.352 and Juv.R. 4(A), such right is not absolute."); *In re C.W.*, 11th Dist. No. 2015-A-0062, 2016-Ohio-3235, ¶ 16 ("Although due process concerns require the appointment of counsel in a given case, the parent's right is not the same as a criminal defendant's right to counsel under the Sixth Amendment.").

{¶ 39} Courts have also inferred a waiver of the right to counsel in a parental termination proceeding where the " 'the total circumstances of the individual case, including the background, experience and conduct of the parent' " indicate that the parent has waived the right to counsel. *G.S.* at ¶ 7, quoting *In re Rachal G.*, 6th Dist. No. L-02-1306, 2003-Ohio-1041, ¶ 14. *See also In re A.L.W.*, 11th Dist. No. 2011-P-0050, 2012-Ohio-1458, ¶ 52 (recognizing that a "trial court may make a specific finding that a waiver of counsel could be inferred considering the totality of the circumstances, or, that the parent has expressly waived counsel"); *Z.Y.* at ¶ 31, citing *In re S.M.*, 8th Dist. No. 81566, 2004-Ohio-1243, ¶ 23; *In re Moore*, 153 Ohio App.3d 641, 2003-Ohio-4250, ¶ 21 (3d Dist.) (finding trial court did not err by allowing parent to proceed without counsel under the totality of the circumstances where he was repeatedly told of his right to counsel, discharged his appointed attorney, stated that he would obtain new counsel but failed to do so, and indicated to the court that he was prepared to proceed pro se).

{¶ 40} Here, the record of the permanent custody hearing reflects that the following dialogue occurred at the beginning of the hearing on February 3, 2015:

> [The Court]: As a preliminary matter, it's come the Court's attention that father, [appellant] is asking to -- that I release his attorney. *Is that still your desire* [appellant]?
>
> [Appellant]: *Yes.*
>
> [The Court]: You need to speak up, we're -- we're recording this.
>
> [Appellant]: Yes.
>
> [The Court]: And can you tell me why?
>
> [Appellant]: I've had no help.
>
> [The Court]: Have you met with your counsel?
>
> [Appellant]: Yes.
>
> [The Court]: And how many times?
>
> [Appellant]: Every time we come to court.
>
> [The Court]: And so several times?

[Appellant]: Just looking at each other, that's it.

[The Court]: Uh-huh (affirmative response).

[Appellant]: Nothing else. I can't -- I don't see why I need somebody just come look at me and then leave. Even after --

[The Court]: Well, today is the trial, *today your counsel would be asking all the questions for you* in the motion you have filed to return the child to you, --

[Appellant]: *I want to do it.* I want --

[The Court]: -- to your custody and *questioning other witnesses and making objections on your behalf and basically trying -- helping you [try] your case.* And if you discharge him I am not continuing this case, we will go ahead and you will be pro se.

[Appellant]: All right.

[The Court]: And you're telling me that is still what you want to do?

[Appellant]: I don't -- what they tell --

[Appellant's Counsel]: You need to represent yourself.

[Appellant]: Yes.

[The Court]: You -- *do you have any legal training whatsoever*?

[Appellant]: No, not really.

[The Court]: And *do you understand the disadvantage this will put you at in a trial*?

[Appellant]: *I'm all right.*

[The Court]: *You can't go back, once we do this.*

[Appellant]: *I ain't planning on going back no how.*

[The Court]: *And you definitely want to try your case alone*?

[Appellant]: *Yes.*

[The Court]: So you will have a chance to ask questions, but I'll have to tell you when you can ask them, you can't interrupt, --

[Appellant]: Okay.

[The Court]: -- do you understand?

[Appellant]: Okay.

[The Court]: Okay. Counsel, do you want to make a statement.

[Appellant's Counsel]: Yes, just I agree [appellant] that there is a conflict also in the sense that my theory of the case and what I wish to argue is completely different than what [appellant] wishes me to argue. I believe it's the best interest that we argue the merits of the case and the case plan I believe where you will find out is after [appellant] speaks and gives his testimony in his case that you will see that his positions regarding legal matters, regarding the case plans charges and several issues going back several years, which I don't believe is relevant. [Appellant] does want to pursue those issues. Thank you, just to give you some insight.

[The Court]: Okay.

* * *

[W.W.E.'s Counsel]: I would ask if [appellant's counsel] is allowed to withdraw that he remain present as standby counsel just once this gets started, I think he'll realize what's going on and I think it would be helpful to have standby counsel. I represent the child, I don't represent him. I think it'd be helpful for him to have standby counsel.

[Appellant]: Thank you.

[The Court]: Would you be willing to do that, [appellant's counsel]?

[Appellant's Counsel]: I would. I don't -- don't think it'll help based on my experience with [appellant], I think our philosoph[ies] are still together any issues that he's gonna ask any questions of me or recommendations from me based on my experience. I will do whatever this Court wants me to do.

[The Court]: The Court will grant the motion of the -- [appellant] to proceed pro se in part and allow him to proceed

> pro se, but ask that [appellant's counsel] remain as standby counsel should [appellant] decide he needs help.

(Emphasis added.) (Feb. 3, 2015 Tr. at 4-9.)

{¶ 41} First, it is important to note that, on July 31, 2013, the trial court appointed counsel for appellant shortly after appellant filed his motion for legal custody. On February 3, 2015, the scheduled date for the hearing on FCCS's motion for permanent custody and appellant's motion for legal custody, appellant informed the trial court that he sought to terminate his representation. On appeal, appellant contends that the trial court should have informed him of his right to counsel at the hearing. However, appellant was clearly aware of his right to counsel since he was represented by appointed counsel on the date of the hearing. Additionally, appellant's request for a continuance on July 17, 2013 in order to obtain counsel demonstrates he was aware of his right to counsel.

{¶ 42} Appellant also contends the trial court erred by failing to inquire whether appellant "wished it to appoint new counsel to act as his advocate in light of the irreconcilable conflict and the break-down in communication between himself and the lawyer assigned to him." (Appellant's Brief at 33.) Contrary to appellant's contention, we have held in the context of criminal proceedings that, although a party has a right to appointed counsel, there is no right to counsel of that party's choice. *See State v. Boddie*, 10th Dist. No. 12AP-74, 2012-Ohio-5473, ¶ 18 ("[A]n indigent defendant is not entitled to his counsel of choice."), citing *State v. Hairston*, 10th Dist. No. 08AP-735, 2009-Ohio-2346, ¶ 38; *Thurston v. Maxwell*, 3 Ohio St.2d 92, 93 (1965) ("The right to have counsel assigned by the court does not impose a duty on the court to allow the accused to choose his own counsel; the selection is within the discretion of the court."); *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, ¶ 64. Instead, "an indigent defendant is entitled to competent, effective representation from appointed counsel." *Bowman* at ¶ 34.

{¶ 43} " 'Competent representation does not include the right to develop and share a "meaningful attorney-client relationship" with one's attorney.' " *Id.*, quoting *State v. Gordon*, 149 Ohio App.3d 237, 2002-Ohio-2761, ¶ 12 (1st Dist.). "When a defendant expresses concerns or complaints regarding appointed counsel, the trial court has a duty to inquire into the nature of the complaint, make such inquiry a part of the record, and make a decision on the record." *Id.* at ¶ 35, citing *State v. Davis*, 10th Dist. No. 97APA08-

1020 (May 19, 1998), and *State v. Deal*, 17 Ohio St.2d 17 (1969). "Mere personality conflicts or *disputes regarding trial strategy* are insufficient to warrant appointment of new counsel where such conflicts do not interfere with preparation or presentation of a competent defense." (Emphasis added.) *Bowman* at ¶ 35, citing *Thurston*. "Generally, to justify the appointment of new counsel, the defendant must show the relationship with appointed counsel jeopardized the defendant's right to effective assistance of counsel." *Id.*, citing *State v. Coleman*, 37 Ohio St.3d 286 (1988).

{¶ 44} Here, appellant does not allege that his former counsel was unable to competently and effectively represent him. Rather, the record reflects that appellant's former counsel and appellant differed on matters of trial strategy as demonstrated by appellant's former counsel's statement that his "theory of the case and what I wish to argue is completely different than what [appellant] wishes me to argue." (Feb. 3, 2015 Tr. at 7.) Furthermore, appellant did not request appointment of different counsel. Therefore, we cannot find that the trial court erred by failing to inquire of appellant whether he wished for different counsel to be appointed.

{¶ 45} Next, appellant contends the trial court erred by failing "to explain that appointed counsel's assistance pertained not only to [appellant's] custody motion but also to the motion filed by FCCS for permanent custody of [W.W.E.]." (Appellant's Brief at 31.) However, appellant fails to cite to any evidence in the record demonstrating that he was unaware or surprised that the hearing before the trial court concerned not only his motion for legal custody, but also FCCS's motion for permanent custody. Furthermore, we note that the following dialogue occurred during the hearing on February 3, 2015:

> [The Court]: And this is your chance now to tell me two things. One, why I should not grant FCCS' motion for permanent custody and two, why I should return custody of
>
> [W.W.E.] to you, okay.
>
> [Appellant]: Actually, this is what I wanting to do anyhow.

(Feb. 3, 2015 Tr. at 164.) Therefore, we find appellant's contention to be without merit.

{¶ 46} Next, we address appellant's contention that the trial court erred because it "made no inquiry into whether [appellant] was mentally competent to proceed *pro se* which is especially troubling in light of evidence presented at trial suggesting he may very

well struggle with mental health issues." (Appellant's Brief at 38.) R.C. 2151.281(C) provides that "[i]n any proceeding concerning an alleged or adjudicated delinquent, unruly, abused, neglected, or dependent child in which the parent appears to be mentally incompetent or is under eighteen years of age, the court shall appoint a guardian ad litem to protect the interest of that parent."  A trial court's decision whether to appoint a guardian ad litem is reviewed under an abuse of discretion standard.  *In re K.R.*, 11th Dist. No. 2015-T-0008, 2015-Ohio-2819, ¶ 27, citing *In re Sappington*, 123 Ohio App.3d 448, 454 (2d Dist.1997). Here, nothing in the record demonstrates that appellant was mentally incompetent during the proceedings. Furthermore, the trial court found that throughout the pendency of this case, appellant "refused to participate in a psychological exam, refused to do a mental health assessment, * * * and refused to sign releases for medical information."  (Feb. 13, 2015 Decision at 10.)  Therefore, we conclude that the trial court did not abuse its discretion in failing to appoint a guardian ad litem to protect appellant's interest or in making any further inquiry as to appellant's mental competency to proceed pro se.  *See State v. J.T.S.*, 10th Dist. No. 14AP-516, 2015-Ohio-1103, ¶ 29 (finding that "appellant's disclosure that he had received treatment for an unspecified mental or emotional issue '[a] while ago' " did not require court to make further inquiry regarding appellant's competency before accepting the stipulation of the existence of probable cause).

{¶ 47} Finally, we agree with appellant that the waiver must be knowing, intelligent, and voluntary.  Therefore, we consider whether the dialogue between appellant and the trial court demonstrates, under the totality of the circumstances, including all the factors previously discussed, whether appellant knowingly, intelligently, and voluntarily waived his right to counsel.  Here, the record reflects that appellant was voluntarily exercising his right to discharge his appointed counsel as demonstrated by appellant's repeated affirmative answers when asked whether it was his intention to proceed without representation.  The trial court inquired as to whether appellant had any legal experience or training and explained that appellant's counsel would have been responsible for "asking all the questions for you" and "questioning other witnesses and making objections on your behalf and basically trying -- helping you [try] your case." (Feb. 3, 2015 Tr. at 5-6.)   The trial court warned appellant of the dangers of self-

representation by inquiring as to whether appellant understood the "disadvantage this will put you at in a trial." (Feb. 3, 2015 Tr. at 6.) Appellant responded "I'm all right." (Feb. 3, 2015 Tr. at 6.) The trial court further stated, "You can't go back, once we do this." (Feb. 3, 2015 Tr. at 6.) Appellant replied, "I ain't planning on going back no how." (Feb. 3, 2015 Tr. at 7.) The trial court also warned appellant that he would not receive a continuance as a result of his decision to represent himself. Additionally, the trial court ordered appellant's counsel to remain in a standby capacity in the event that appellant should have any questions during the proceedings. Therefore, considering the totality of the circumstances, we cannot find that appellant's waiver of his right to counsel was entered without his knowing, intelligent, and voluntary consent.

{¶ 48} Accordingly, we overrule appellant's first assignment of error.

**B. Third Assignment of Error—Manifest Weight of the Evidence**

{¶ 49} In his third assignment of error, appellant asserts the trial court's decision to award permanent custody of W.W.E. to FCCS was against the manifest weight of the evidence.

{¶ 50} Pursuant to R.C. 2151.414(B)(1), a trial court may grant permanent custody of a child to an agency if the court determines, by clear and convincing evidence, that: (1) it is in the best interest of the child, and (2) one of the four factors set forth in R.C. 2151.414(B)(1) applies. The fourth factor described in R.C. 2151.414(B)(1) is that "[t]he child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period." R.C. 2151.414(B)(1)(d).

{¶ 51} Here, the record reflects, and appellant does not contest, that W.W.E. had been in the custody of FCCS for 12 or more months of a consecutive 22-month period. Accordingly, because the statutory factor set forth in R.C. 2151.414(B)(1)(d) had been established, the court was statutorily authorized to grant FCCS permanent custody of W.W.E. if clear and convincing evidence existed that it was in W.W.E.'s best interest to do so. Clear and convincing evidence is the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established." *In re D.C.*, 10th Dist. No. 08AP-1010, 2009-Ohio-2145, ¶ 9, citing *In re Abram*, 10th Dist. No. 04AP-220, 2004-Ohio-5435. *See also Cross v. Ledford*, 161 Ohio

St. 469 (1954), paragraph three of the syllabus. Clear and convincing evidence does not mean the evidence must be clear and unequivocal, nor does it require proof beyond a reasonable doubt. *D.C.* at ¶ 9.

{¶ 52} In determining whether granting permanent custody to a public children services agency is in the child's best interest, the court must consider all relevant factors, including the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e). *See In re V.B.-S.*, 10th Dist. No. 13AP-478, 2013-Ohio-5448, ¶ 36. The additional factors referenced by R.C. 2151.414(D)(1)(e) are:

> (7) The parent has been convicted of or pleaded guilty to one of [a list of criminal offenses].
>
> (8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to

> treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.
>
> (9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.
>
> (10) The parent has abandoned the child.
>
> (11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

R.C. 2151.414(E)(7) through (11).

{¶ 53} Moreover, pursuant to R.C. 2151.414(C), in determining the best interest of a child, a court "shall not consider the effect the granting of permanent custody to the agency would have upon any parent of the child." *See In re G.P.,* 5th Dist. No. 2013CA00126, 2013-Ohio-4692, ¶ 43, citing *In re Awkal,* 95 Ohio App.3d 309, 315 (8th Dist.1994). Similarly, R.C. 2151.414(C) prohibits a court from "deny[ing] an agency's motion for permanent custody solely because the agency failed to implement any particular aspect of the child's case plan."

{¶ 54} In reviewing a judgment granting permanent custody of a child to a public children services agency, we will not reverse the trial court's determination unless it is against the manifest weight of the evidence. *In re M.E.V.,* 10th Dist. No. 08AP-1097, 2009-Ohio-2408, ¶ 10, citing *In re Andy-Jones,* 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28. " 'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.

* * * Weight is not a question of mathematics, but depends on [the evidence's] effect in inducing belief." ' " (Emphasis deleted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). *See C.G.* at ¶ 31. Thus, in reviewing a judgment under the manifest-weight standard, a court of appeals weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Eastley* at ¶ 20.

{¶ 55} " ' Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.' " *Id.*, quoting *C.E. Morris Co. v. Foley Constr. Co.,* 54 Ohio St.2d 279, 280 (1978). Moreover, we recognize that " '[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceedings and the impact the court's determination will have on the lives of the parties concerned.' " (Citation omitted.) *In re W.D.*, 10th Dist. No. 09AP-589, 2009-Ohio-6903, ¶ 34, quoting *In re A.D.*, 10th Dist. No. 08AP-238, 2008-Ohio-3626, ¶ 8.

{¶ 56} At the hearing, the trial court interviewed W.W.E. in camera. W.W.E. stated that he was nine years old and in the third grade. When asked by the trial court where he would want to live, W.W.E. first stated that he wished to live with his foster parents. W.W.E. stated that there were four other children in his foster parents' house and that he enjoyed living with them. W.W.E. stated that he understood what adoption meant and that it was "[f]or the rest of your life." (Feb. 3, 2015 Tr. at 15.) W.W.E. could not remember visiting with his father. When asked "if your dad was asking for you to live with him, what would you say to that," W.W.E. replied, "I don't know." (Feb. 3, 2015 Tr. at 16.) Later, W.W.E. stated that he would like to live with appellant. W.W.E. also stated that he wished to live with L.E., but that if he could not live with his mom, then he would like to live with his foster parents. W.W.E. stated that he sometimes called his foster parents "mom" and "dad." (Feb. 3, 2015 Tr. at 19.)

{¶ 57} Appellant was called on cross-examination by FCCS. Appellant testified that he lived alone in Lovely, Kentucky in a single story, two bedroom home.  He previously lived in Columbus with L.E. and W.W.E. until January 2012 when FCCS received custody of W.W.E.  He testified that he "[p]robably" had "about" eight children, but also stated that he "might" have eight other children, not including W.W.E.  (Feb. 3, 2015 Tr. at 36-37.)  Appellant stated all of his other children were adults who lived in different states. Appellant stated that he was married to L.E. at the time of W.W.E.'s birth, signed W.W.E.'s birth certificate, and was W.W.E.'s father.

{¶ 58} Appellant repeatedly stated that he refused to comply with the case plan, despite understanding that he was required to do so, because he believed that he did not do anything wrong.  However, appellant also claimed that he possessed a court order at his home in Kentucky stating that he did not have to complete the case plan:

> [Counsel for FCCS]: And do you understand what you needed to do under the case plan in for reunification to happen with your child?
>
> [Appellant]: If I have done nothing wrong to my child, you should not be allowed to take my child from me.
>
> [Counsel for FCCS]: Do you understand that the case plan that was developed by the service team was made an order of the Court for you to complete?
>
> [Appellant]: Yes. And I also know that July the 17th, 2013 the Judge said you don't have to do a case plan.
>
> [Counsel for FCCS]: And what Judge would have said that?
>
> [Appellant]: Actually, I got the court order * * *.
>
> * * *
>
> [The Court]: So you think you have it with you this order you're talking about?
>
> [Appellant]: I do not have it with me today.
>
> [The Court]: Okay.
>
> * * *
>
> [The Court]: It's not appearing on the record at all.

\* \* \*

[Counsel for FCCS]: Okay. Back to the case plan, that was made an order of the Court. Do you know what you were required to do under that case plan?

\* \* \*

[Appellant]: Yes.

[Counsel for FCCS]:What were you supposed to do?

[Appellant]: Whatever they asked me to do.

[Counsel for FCCS]: What did they ask you to do?

[Appellant]: All kinds of stuff. There's a case plan about that thick that I'm not gonna sit here and explain.

\* \* \*

[Counsel for FCCS]: All right. Were you requested to do a psychological?

[Appellant]: Probably.

[Counsel for FCCS]: Were you requested to do drug screens?

[Appellant]: Probably.

[Counsel for FCCS]: Were you requested to have appropriate housing?

[Appellant]: Yes.

\* \* \*

[Counsel for FCCS]: Were you required to show proof of income?

[Appellant]: Yes, no, well, I don't know maybe. I don't know.

[Counsel for FCCS]: In regards to the requirement to do a psychological, did you complete psychological evaluation?

[Appellant]: No. I didn't do nothing -

[Counsel for FCCS]: You did not complete -

[Appellant]: - and I ain't going to.

* * *

[Counsel for FCCS]: The last component of your case plan that I wanted to talk about was the drug screens. Have you completed any drug screens for the Agency?

[Appellant]: I have done nothing on that case plan, nothing and I will not do nothing.

(Feb. 3, 2015 Tr. at 40, 43, 46-48, 64.)  We note that, on review, the record does not reflect an order from the court stating that appellant did not have to comply with the case plan that was approved and adopted in the February 29, 2012 order of the trial court.

{¶ 59} Appellant stated that an ICPC examination was completed at his home in Kentucky.  Appellant claimed that the study concluded it was acceptable for W.W.E. to live with him, although he did not receive a written statement that the ICPC was approved.

{¶ 60} Appellant testified that he received around $800 to $850 per month from Social Security Disability Income, but claimed that he did not know why he received such money.  Appellant admitted that he did not sign the release requested by FCCS to verify his Social Security Disability Income.

{¶ 61} Appellant testified that since FCCS received custody of W.W.E. in January 2012, he visited with W.W.E. once in July 2013 and saw him once at a court hearing in September 2014.  Appellant admitted that FCCS offered to give him bus passes to come visit his son. Appellant initially denied being offered funds for gasoline to travel to see W.W.E., but later admitted that FCCS discussed offering him such funds for gasoline.

{¶ 62} Vanja Dosan, the FCCS caseworker assigned to W.W.E., testified that, pursuant to the case plan, L.E. was required to complete an alcohol and other drug ("AOD") assessment, a psychological evaluation, a mental health assessment, drug screens, and have safe and stable housing and income.  According to Dosan, L.E. completed an AOD assessment, a psychological evaluation, and a mental health assessment. L.E. attended counseling in early 2013, but stopped going after a few months. L.E. resumed counseling later that year, but again stopped after a few months. L.E.

completed some drug screenings but, after failing a drug screening, admitted she was continuing to abuse drugs. L.E. last completed a drug screen in October 2014.

{¶ 63} Dosan stated that she had ongoing concerns with L.E.'s drug use and inappropriate housing. L.E. initially prohibited Dosan from visiting her current residence, which was a one bedroom apartment in which L.E., L.E.'s boyfriend, and a roommate lived. Dosan had continuing concerns with L.E.'s residence because there was not enough space for W.W.E., everyone residing at the apartment did not come to FCCS to have their fingerprints recorded as required by the home study process, and there were pill bottles visible in the apartment.

{¶ 64} Dosan testified that, under the case plan, appellant was required to complete an AOD assessment, a psychological evaluation, a mental health assessment, drug screens, and have stable housing and income. Dosan had no knowledge that appellant abused drugs or had mental health or psychological issues. However, Dosan noted that, based on her observations of and interactions with appellant, such assessments may be appropriate. Dosan stated that appellant's case plan requirements were the same as L.E.'s because they were married and living together at the time W.W.E. was removed from the residence. Furthermore, although Dosan did not prepare appellant's case plan objectives, she believed they were "proper services to request for him." (Feb. 3, 2015 Tr. at 90.)

{¶ 65} Dosan stated that W.W.E. had been in three foster homes since being placed in FCCS's custody in January 2012 and had been in his current foster home since January 2013. Dosan visited W.W.E. in his current foster home every 30 days. W.W.E. appeared to be bonded with his foster parents, looked to them for basic needs to be met, and appeared to be comfortable with them. Dosan had no concerns regarding W.W.E.'s placement with his foster family.

{¶ 66} Finally, Dosan stated that she did not believe either L.E. or appellant had made sufficient progress with their case plan services to allow W.W.E. to be placed with them.

{¶ 67} Tobi Fliegel, lay guardian ad litem, testified that she had observed W.W.E. with L.E. during a visitation at FCCS. Fliegel had no concerns based on her observations of L.E. and W.W.E. at the visitation. Fliegel had no contact with appellant. Fliegel also

observed W.W.E. with his foster family, with the exception of the foster mother. Fliegel had no concerns with W.W.E.'s interactions with his foster father and the other children in the home and found that W.W.E. appeared to be bonded to the foster family. Fliegel stated that she believed it was in W.W.E.'s best interest for FCCS to receive permanent custody of W.W.E. for purposes of adoption by the foster family.

{¶ 68} At the conclusion of the first day of the hearing on February 3, 2015, the trial court granted a one-week continuance over FCCS's objection to allow appellant to obtain documents and witnesses for trial. On February 10, 2015, when the hearing resumed, appellant failed to produce any additional witnesses or evidence.

{¶ 69} On rebuttal, FCCS presented the ICPC report, which was admitted over objection by W.W.E.'s counsel. The ICPC report denied placement of W.W.E. in appellant's house due to, in part, appellant's past history of non-compliance with investigations, current history of non-compliance with the case plan, and non-compliance in regards to signing releases for mental health records.

{¶ 70} In its decision granting FCCS's motion for permanent custody, the trial court made findings with regard to each of the factors enumerated in R.C. 2151.414(D)(1). Appellant argues that the trial court erred in three separate ways.

{¶ 71} First, appellant argues that the trial court erred with regard to the factors listed in R.C. 2151.414(D)(1)(a) and (b) because appellant took care of W.W.E. in the past, appellant and W.W.E. interacted well, W.W.E.'s foster family did not testify at the hearing, and W.W.E. indicated that he would like to live with appellant, among others. Pursuant to R.C. 2151.414(D)(1)(a) and (b), the trial court is required to consider the child's interaction and interrelationship with the individuals identified in the statute and the child's wishes expressed directly by the child or through the child's guardian ad litem.

{¶ 72} With regard to R.C. 2151.414(D)(1)(a), the record reflects that L.E. visited W.W.E. under the supervision of FCCS, that there was a bond between L.E. and W.W.E., and that there were no concerns noted at the monitored visitations. Appellant visited W.W.E. only once in July 2013. Based on appellant's single visit to see W.W.E., the caseworker was not able to observe a bond between W.W.E. and appellant. Nevertheless, because W.W.E. ultimately stated that he would like to live with appellant, among several other choices, the trial court "infer[red] some bond exists even with the long separation

between [W.W.E. and appellant]." (Feb. 13, 2015 Decision at 7.) The record also reflects that W.W.E. was bonded to his foster family. W.W.E.'s needs were met, he was comfortable with his foster family, and bonded with them. He sometimes referred to his foster parents as "mom" and "dad." Although the foster parents did not participate in the permanent custody hearing, no issue was raised regarding their participation. We find no error with regard to the trial court's analysis of R.C. 2151.414(D)(1)(a).

{¶ 73} With regard to R.C. 2151.414(D)(1)(b), W.W.E. stated that he understood the concept of adoption and that it was a permanent decision. W.W.E. stated he still wished to live with L.E. and that he wished to continue to live with his foster parents. W.W.E. could not remember whether appellant visited him. When he was initially asked what his response would be to living with his father, he stated, "I don't know." (Feb. 3, 2015 Tr. at 16.) However, later in the interview, he stated he also wished to live with appellant if appellant wished for W.W.E. to live with him. The trial court concluded that W.W.E. was happy where he was but also wished to return to his parents and did not wish to cease contact with them. The guardian ad litem recommended that the court grant the motion for permanent custody for purposes of adoption. We find no error with regard to the trial court's analysis of R.C. 2151.414(D)(1)(b).

{¶ 74} Second, appellant argues that the trial court erred with regard to its consideration of R.C. 2151.414(D)(1)(c) because it was never alleged appellant had abused, neglected, or caused W.W.E. to become dependent. Pursuant to R.C. 2151.414(D)(1)(c), the trial court is required to consider the child's custodial history. On February 22, 2012, the magistrate held a hearing at which W.W.E. was adjudicated to be an abused, neglected, and dependent child. Appellant did not appear at that hearing. On February 29, 2012, the magistrate filed a decision reflecting the findings of the February 22, 2012 hearing. Appellant did not file objections to that decision, which was then adopted by the trial court. Furthermore, the trial court found that W.W.E. had been in the custody of FCCS for 12 or more months of a consecutive 22-month period. We find no error with the trial court's analysis of R.C. 2151.414(D)(1)(c).

{¶ 75} Finally, appellant argues that, contrary to the trial court's findings with regard to R.C. 2151.414(D)(1)(d), appellant's failure to cooperate with FCCS's case plan was not an indication that he was an unfit parent for W.W.E. Pursuant to R.C.

2151.414(D)(1)(d), the trial court is required to consider the child's need for a legally secure permanent placement.

{¶ 76} The trial court found that W.W.E. is "in great need of a legally secure placement," in part due to the fact that "he has been in counseling for anxiety and social problems when he interacts with other children." (Feb. 13, 2015 Decision at 9.) The trial court found that L.E. had not substantially completed her case plan by complying with her drug screenings and attaining suitable housing.

{¶ 77} The trial court found that "[a]lthough [appellant] was aware of the [case] plan and understood what he needed to do to reunify with his son, he refused to participate in a psychological exam, refused to do a mental health assessment, refused to do an alcohol/drug assessment, refused to participate in drug screens and refused to sign releases for medical information, and never proved exactly what income he derives from Social Security disability or why he is receiving Social Security disability. For these reasons alone, custody to [appellant] is not in the best interests of [W.W.E.]." (Feb. 13, 2015 Decision at 10.) Appellant claims that he should not have been required to comply with the case plan because it was never established that the terms of the case plan were necessary for him. The magistrate approved and adopted the case plan at the February 22, 2012 hearing, and the case plan was made an order of the court in the February 29, 2012 judgment entry that was adopted by the trial court. As previously stated, appellant did not appear at the February 22, 2012 hearing and did not file objections to the magistrate's decision. Appellant's contentions are without merit. We find no error with the trial court's analysis of R.C. 2151.414(D)(1)(d).

{¶ 78} In consideration of the foregoing, we find that competent, credible evidence supports the trial court's determination that it was in W.W.E.'s best interest to grant FCCS's motion for permanent custody. Having weighed the evidence and all reasonable inferences and considering the credibility of witnesses, we cannot find that the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. Accordingly, we overrule appellant's third assignment of error.

**C. Second Assignment of Error—Admission of Evidence**

{¶ 79} In his second assignment of error, appellant asserts the trial court erred by admitting the ICPC report into evidence.

{¶ 80} We first note that because appellant failed to object to the admission of the report, our review is limited to consideration of whether the trial court committed plain error. *State v. Hairston*, 10th Dist. No. 01AP-299 (Oct. 18, 2001), citing *State v. Robertson*, 90 Ohio App.3d 715, 728 (2d Dist.1993) ("The failure to object to evidence at trial constitutes a waiver of any challenge on that evidence on appeal, except for plain error."); *State v. Humberto*, 196 Ohio App.3d 230, 2011-Ohio-3080, ¶ 28 (10th Dist.), citing *State v. Maurer*, 15 Ohio St.3d 239, 259 (1984); *In re H.D.D.*, 10th Dist. No. 12AP-134, 2012-Ohio-6160, ¶ 71, citing *In re Moore*, 10th Dist. No. 04AP-229, 2005-Ohio-747, ¶ 8; *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, ¶ 44. " 'To constitute plain error, the error must be obvious on the record, palpable, and fundamental such that it should have been apparent to the trial court without objection.' " *State v. Jones*, 10th Dist. No. 14AP-80, 2014-Ohio-3740, ¶ 11, quoting *State v. Gullick*, 10th Dist. No. 13AP-26, 2013-Ohio-3342, ¶ 3, citing *State v. Tichon*, 102 Ohio App.3d 758, 767 (9th Dist.1995).

{¶ 81} In a civil case, "reviewing courts must proceed with the utmost caution, limiting the doctrine strictly to those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a material adverse effect on the character of, and public confidence in, judicial proceedings." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121 (1997). This court has previously applied the plain error standard of review in termination of parental rights cases. *See In re A.H.*, 10th Dist. No. 15AP-1, 2015-Ohio-4461, ¶ 16-17; *In re: K.J.D.*, 10th Dist. No. 12AP-652, 2013-Ohio-610, ¶ 44-55.

{¶ 82} Juv.R. 34(B)(2) provides that "[e]xcept as provided in division (I) of this rule, the court may admit evidence that is material and relevant, including, but not limited to, hearsay, opinion, and documentary evidence." Juv.R. 34(I) provides that "[t]he Rules of Evidence shall apply in hearings on motions for permanent custody." Therefore, pursuant to Juv.R. 34(I), the Rules of Evidence applied at the trial court's hearing on FCCS's motion for permanent custody. *In re M.C.*, 12th Dist. No. CA2014-05-098, 2014-Ohio-4521, ¶ 47 ("Permanent custody hearings are the exception to the general rule that

hearsay can be considered in juvenile custody dispositions."); *In re C.H.*, 9th Dist. No. 12CA0055, 2013-Ohio-633, ¶ 23; *In re W.R.*, 12th Dist. No. CA2011-08-016, 2012-Ohio-382, ¶ 22; *Swisher* at ¶ 49.

{¶ 83} Even if we assume, without deciding, that the ICPC report should not have been admitted into evidence, appellant has failed to demonstrate, with reference to the record or relevant authority, that the admission of the ICPC report prejudiced him.  In light of our analysis of the second assignment of error and in consideration of the abundance of other evidence submitted to the trial court, we find that error, if any, arising from the admission of the ICPC report into evidence was harmless.  *C.H.* at ¶ 23. Therefore, we do not find that this is the extremely rare case where application of the plain error doctrine is warranted to prevent a manifest miscarriage of justice. Accordingly, we overrule appellant's second assignment of error.

## IV.  Conclusion

{¶ 84} Having overruled appellant's three assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

DORRIAN, P.J., SADLER, and HORTON, JJ., concur.